**Verna L. Polikoff, Plaintiff-Appellant, v. Dole & Clark Building Corporation and Paul A. Grundman, Defendants-Appellees.**

**Gen. No. 48,289.**

First District, First Division.

August 20, 1962.

Rehearing denied September 6, 1962.

Tannenbaum & Polikoff, of Chicago, for appellant.

Charles L. Stewart, Jr. and Thomas S. James, of Chicago (Mayer, Friedlich, Spiess, Tierney, Brown & Platt, of counsel), for appellees.

MR. JUSTICE ENGLISH delivered the opinion of the court.

On motion of defendants, the trial court struck plaintiff's amended complaint as amended. When plaintiff elected to stand on her pleading, the court dismissed the action. Plaintiff appeals.

The complaint seeks to set forth a cause of action, on behalf of a minority shareholder, for the liquidation of an Illinois corporation in the exercise by the court of either statutory or inherent equity authority.

Plaintiff argues that equity has jurisdiction to order liquidation of a corporation, independent of any statutory authorization. The Illinois cases, however, have long and repeatedly declared the contrary of this proposition, so we shall consider the complaint only on the basis of the liquidation authority conferred upon the court by the Business Corporation Act. (Wheeler v. Pullman Iron and Steel Co., 143 Ill 197, 204, 32 NE 420; Cedar Bluff Cemetery Ass'n v. Zuck, 3 Ill App2d 178, 186, 120 NE2d 875; Central Standard Life Ins. Co. v. Davis, 10 Ill2d 566, 572, 141 NE2d 321, affirming 10 Ill App2d 245, 252, 134 NE2d 653.)

The parts of the statute pertinent to this case (Ill Rev Stats c 32, § 157.86(a)(3), (4)) provide:

31

Courts of equity shall have full power to liquidate the assets and business of a corporation:

(a) In an action by a shareholder when it is made to appear:

. . . . .

(3) That the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent; or

(4) That the corporate assets are being misapplied or wasted.

The complaint fills fifty pages of the record. In brief, it alleges:

Defendant corporation was organized in 1933 under a plan of reorganization for a defaulted real estate bond issue. The real estate, which is the principal asset of the corporation, consists of a building containing a theater, nine stores, and a 65-room hotel, located at Clark Street and Drummond Place in Chicago.

The stock consists of 942.5 shares of Class A (ineligible for dividends, and having a value on liquidation of $100 per share), and 1015.2 shares of Class B (ineligible for dividends while any Class A shares are outstanding).

Members of defendant Grundman's family own 517.5 shares of Class A (approximately 55%), and 767.7 shares of Class B (approximately 76%).

Plaintiff owns 15 shares of Class A (approximatey 1.6%), and 6 shares of Class B (approximately .6%). Her shares represent an investment of $1200 in 1951.

During the years in question (1952–1958), defendant Grundman was president, a director and manager of the property; his son-in-law was secre-

32

tary and a director; and, since 1958, his daughter has held the third directorship.

During the years 1952 through 1957 the corporation sustained losses averaging $4935 after making allowances for depreciation. During those years, receipts execeeded expenditures by an average of approximately $4250. For the year 1958 the corporation showed a profit of $1740 after depreciation.

The net worth increased some $16,500 during 1958 to approximately $123,000.

The theater has been closed since April 3, 1958 and has produced no income. For several years prior to that time, the motion picture business in Chicago had been poor and many theaters had closed. There are at least two other motion picture theaters in the vicinity of the corporation's theater.

In 1953 Grundman's wife made a loan of $60,000 to the corporation and was given a mortgage on the real estate. The interest rate is 5% and all payments of interest have been made as they matured. No payment has been made on principal, which was due in 1958 but has been extended to 1963. The mortgage contains a waiver of the right of redemption.

Directors' fees of $300 per year were paid until 1958, when they were eliminated.

Grundman was paid $6000 per year for his services as president of the corporation, manager of the real estate and operating manager of the hotel. It is claimed that this compensation was grossly excessive in view of the financial condition of the corporation. Grundman also took a three-month vacation in 1957 without diminution in compensation.

The corporation spent $60,000 on rehabilitation of the building when it was uncertain whether or not the payments on Mrs. Grundman's mortgage could be maintained. Thus, a foreclosure would inure to the benefit of the Grundman family.

Only about half of the hotel rooms were rented; too little was spent on advertising the hotel; no new tenant was obtained for the theater; Grundman refused to have the corporation operate the theater itself, and failed to communicate with plaintiff concerning a lead to a possible tenant.

Contrary to plaintiff's advice, Grundman has refused to let the corporation sell the real estate. Because of Mrs. Grundman's mortgage, her husband is not in a position to exercise his fiduciary obligations impartially and in the best interest of the corporation.

The corporation's surplus was not used to retire Class A shares during the years in question.

The Grundman family have been buying shares at depressed prices.

Grundman refused to follow suggestions made by plaintiff for the management of the corporation's affairs and he caused the corporation to expend money for attorneys' fees in opposing plaintiff's suit. He and Mrs. Grundman also refused to accept other suggestions of plaintiff calculated to weaken the corporation's mortgage commitment to Mrs. Grundman.

The corporation is in danger of losing its principal asset to Mrs. Grundman through a foreclosure which could be manipulated by those in control of the corporation for their own benefit.

Because of the condition of the corporation there is no reasonable prospect of profitable operation and, therefore, no reasonable prospect of its achieving the principal object for which it was formed—the retirement of its Cass A shares.

34

The prayer of the complaint is primarily for liquidation of the corporation. All its other prayers relate to the details of such a liquidation and are dependent upon it.

The gist of defendants' motion to strike is that the complaint does not allege facts constituting illegal, oppressive, or fraudulent acts on the part of those in control of the corporation, or facts constituting waste or misapplication of corporate assets.

■ While plaintiff has applied the statutory words "illegal" and "fraudulent" to the acts of defendants set forth in the complaint, no attempt has been made to point out wherein lies the illegality or fraud. We, therefore, believe that these two points, being mere characterizations, are not seriously advanced, nor worthy of serious consideration. (Simpson v. Adkins, 311 Ill App 543, 551, 37 NE2d 355; Sulinski v. Humboldt & Wabansia Bldg. Corp., 315 Ill App 392, 402, 43 NE2d 181.)

The burden of plaintiff's brief is that Grundman's acts, as outlined, were oppressive and constituted misapplication or waste of corporate assets. The background against which these charges are to be considered is of extreme importance. That background is the routine organization of all corporate entities. As stated by our Supreme Court in words fully as cogent today as when written sixty years ago:

"It is, however, fundamental in the law of corporations, that the majority of its stockholders shall control the policy of the corporation, and regulate and govern the lawful exercise of its franchise and business. . . . Every one purchasing or subscribing for stock in a corporation impliedly agrees that he will be bound by the acts and proceedings done or sanctioned by a majority of the shareholders, or by the agents of the corporation duly chosen by such majority, within the scope of the powers conferred by the charter, and courts of

35

equity will not undertake to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted and the business more successful if other methods were pursued. The majority of shares of its stock, or the agents by the holders thereof lawfully chosen, must be permitted to control the business of the corporation in their discretion, when not in violation of its charter or some public law, or corruptly and fraudulently subversive of the rights and interests of the corporation or of a shareholder." (Wheeler v. Pullman Iron and Steel Co., 143 Ill 197, 207, 32 NE 420; quoted with approval in Central Standard Life Ins. Co. v. Davis, 10 Ill App2d 245, 250–251, 134 NE2d 653.)

██ ██ The Business Corporation Act has given to the courts the power to relieve minority shareholders from oppressive acts of the majority, but the remedy of liquidation is so drastic that it must be invoked with extreme caution. The ends of justice would not be served by too broad an application of the statute, for that would merely eliminate one evil by substituting a greater one—oppression of the majority by the minority.

The only Illinois decision in which dissolution was ordered on the ground of oppression, and the case on which plaintiff places chief reliance, is Gidwitz v. Lanzit Corrugated Box Co., 20 Ill2d 208, 170 NE2d 131. The facts in that case, however, were so disparate as to furnish no guide whatsoever to our decision in the case at bar. In Gidwitz there were two groups of shareholders, each owning 50% of the stock, and each with two directors. In the resultant impasse, the president operated the corporation "in an arbitrary and high-handed manner" as though it were a sole proprie-

36

torship. The heart of the complaint, and of the opinion, as we understand it, was that the president controlled the corporation in an oppressive manner "through the medium of the deadlock among the directors and the stockholders." It was claimed "that the 'deadlock' is 'oppressive' to the plaintiffs as shareholders because they, as directors, are precluded thereby from participating at the policy level in the direction and supervision of Joseph Gidwitz's activities as president of the corporation."

The deadlock had existed for ten years. During that period the president had repeatedly violated or ignored the bylaws of the corporation. No annual meetings were held at which shareholders were permitted to vote for directors. Only a few meetings of directors were held, at which no matters of business or corporate policy were presented for action, approval, or even discussion. The president made a personal profit on dealings with the corporation. The continuing course of oppressive conduct by Gidwitz in abusing and denying the rights of the plaintiffs as officers and directors, as well as shareholders, is a far cry from the facts alleged in the instant complaint. This comparison highlights our conclusion that the acts charged to Grundman are merely the exercise of business judgment which cannot be made subject to the attack of disgruntled minority shareholders without destroying the practicality of the corporate form.

Because of the scarcity of decisions declarative of oppressive conduct, we shall cite, without discussion, a number of cases of foreign jurisdictions which, like Gidwitz, concern actions so extreme when contrasted with the facts in the case at bar, as to furnish support for our position: Elder v. Elder & Watson (1952), SC 49, Scot; Scottish Co-operative Wholesale Society, Ltd. v. Meyer (1958), 3 All ER 66 (HL) ; Re H. R. Harmer,

37

Ltd. (1958), 3 All ER 689 (CA); Loch v. John Black-wood, Ltd. (1924), AC 783 (HL).

Almost all aspects of plaintiff's charges relate solely to business decision-making which by our statute is made the responsibility of the board of directors and the officers of a corporation. Whether Grundman spent too much or too little for advertising, or for salaries, or for rehabilitation of the premises, are matters with which the court will not concern itself—at least not in so far as they bear on the question of liquidation. (Bixler v. Summerfield, 195 Ill 147, 150, 62 NE 849.) We do not find in the allegations of the complaint sufficient facts to establish oppressive conduct by the management. Nor do we find misapplication or waste of corporate assets.

■ Along a somewhat similar line, plaintiff argues for liquidation because there is no reasonable expectation of profitable operation. From the facts submitted, we cannot agree. We do not, of course, predict that this will be a profitable enterprise, but, as said in Central Standard Ins. Co. v. Davis, 10 Ill2d 566, 577, 141 NE2d 45: "Time may show that there is no reasonable prospect of profitable operation. The present record does not."

■ As to the mortgage, the complaint does not allege any facts indicating impropriety in the corporation's borrowing from Mrs. Grundman the money which it needed for rehabilitation of its property. The fact, if it be a fact, that Mr. and Mrs. Grundman have thereby placed themselves in such a position that Grundman might violate his fiduciary obligations to the corporation—that is not enough to justify the relief sought in this complaint. Every corporate director or officer is in a position to betray his position of trust from the moment of his election.

The complaint was properly stricken, and, plaintiff having stood on her pleading, the action was properly dismissed. The order of the Circuit Court is, therefore, affirmed.

Affirmed.

MURPHY, J., concurs.

BURMAN, P. J., dissenting:

The defendant's motion to strike the amended complaint admits the facts averred for the purpose of the motion. Villareal v. Trevino, 30 Ill App2d 77, 173 NE 2d 582. The only question presented by the motion is whether the amended complaint states a good cause of action. It is my opinion that the allegations in the amended complaint set forth factual misconduct by defendants in the operation and control of the corporate real estate requiring defendants to answer and defend.

Broad application should be given Sec (a)(3) and (4) of the Business Corporation Act, Ill Rev Stats, c 32, § 157.86(a)(3) and (4). This is particularly true when the alleged misconduct involves the sole asset of the corporation, here a parcel of real estate consisting only of a theater, nine stores and a sixty-five room hotel. The corporation itself came about through a plan of reorganization out of a foreclosing proceeding. Pursuant to the plan the real estate was conveyed to the corporation and Class A and Class B stock was issued to the owners of the bonds and to the owner of the equity right of redemption. The plan provided that Class A stock was to be retired out of the surplus or net profits and no dividends were to be paid on either class of stock until the Class A is redeemed.

It is alleged that the stockholders face the likelihood of losing this property to the members of the Grund-

man family who are the directors and officers of the corporation, and who exclusively manage and control its operations. In 1953, Mrs. Paul Grundman, wife of the corporate president, loaned $60,000 to the corporation and received a mortgage conveying the real estate as security. The mortgage also contained a waiver of the right of redemption.

During the six year period from 1952 to 1957, inclusive, the average yearly rental amounted to $47,395.66, of which over $15,000 represented rent from the theater. The theater has been closed since April 3, 1958, and no income has been derived from it since that date. According to the operating statements the corporation suffered a loss each year during the six year period. While nothing has been paid on the principal, Mrs. Grundman has received the 5% annual interest on the mortgage. It matures in 1963. During the six year period the corporate president has received $6,000 a year for managing the property while the directors received a total of $900 a year. The $60,000 received on the mortgage was expended on rehabilitation of the property. During the six year period none of the Class A stock was retired.

It is alleged that the fees paid and expenditures made "were fantastically high"; that instead of retiring Class A stock, one of the original purposes for which the corporation was formed, the mortgage money was expended to protect the mortgagee's, Mrs. Grundman's, interests. There are other numerous specific charges which, if true, are serious and should be met. For example, the expenses incurred by the Grundman family were considerably reduced in 1958, after the filing of the original complaint. In addition, the depreciation charges were adjusted in 1958 so that the balance sheet showed a profit for the first time in seven years.

The allegations show that there is no reasonable prospect of a profitable operation. During the six years from 1952 to 1957, inclusive, the Grundmans had been purchasing shares of stock at depressed prices. The corporation did not show a profit when the theater was in operation. This lost rent is almost one-third the former income. Moreover, by holding the mortgage in addition to controlling the board of directors, the Grundman family occupies a doubly dominant position. I am not impressed with defendant's contention that liquidation should not be ordered on the grounds of "oppressive" acts unless the shareholders are deadlocked. If we were to so find we would in effect be revising the statute and no matter how wrongful the acts of directors would be the statute would then be ineffectual. In my opinion, if the minority shareholder can prove her allegations, the defendants would have the burden of establshing the fairness of their positions and actions. The motion to strike should have been overruled and the defendants should have been ordered to answer.