JAMES J. CODUTI, Plaintiff-Appellant, *v.* WERNER E. HELLWIG *et al.*, Defendants-Appellees.

First District (5th Division)   No. 82—2222

Opinion filed July 20, 1984.—Supplemental opinion filed on denial of rehearing October 12, 1984.

DiMonte & Lizak, of Chicago (Edward G. Proctor, Theodore J. Low, and Eugene A. DiMonte, of counsel), for appellant.

Pedersen & Houpt, of Chicago (Steven M. Stone and Jonathan B. Gilbert, of counsel), for appellee Hudson Tool & Die Corp.

Katz, Karacic & Helmin, of Chicago (Kenneth A. Helmin and Thomas J. Karacic, of counsel), for appellee Werner E. Hellwig.

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

This is an action by James J. Coduti (Coduti), a minority shareholder of Hudson Tool & Die Corporation (Hudson), a closely held Illinois corporation, seeking dissolution of the corporation and an accounting of allegedly improper benefits received from the corporation by its controlling shareholder and members of the family of and entities controlled by such shareholder.[1] The trial court sitting without a jury found for the defendants. Coduti raises the following issues on appeal: (1) whether the trial court erred in refusing to order dissolution of defendant corporation and (2) whether the trial court erred in refusing to order an accounting of the benefits received from defendant corporation by the other defendants. We affirm.

The trial court heard testimony in this matter on 24 separate days and received into evidence more than 150 exhibits, many of which were group exhibits consisting of more than one item. A repetition of all of the testimony would serve only to unduly lengthen this opinion; therefore, testimony will be recounted only insofar as it is necessary to our disposition of the instant issues. However, a brief statement regarding the parties is in order.

Defendant Hudson engaged in the tool and die and metal stamping business and was formed in 1954 by plaintiff Conduti and defendant Werner E. Hellwig (Hellwig). Defendant Kurt Hellwig (Kurt) is Hellwig's son and has held an executive position with Hudson since 1979. Defendant Hollywood Perforators, Inc. (Hollywood), is an Illinois corporation controlled by Hellwig and Kurt.[2]

---

[1]Coduti also sought a declaration that he is the owner of certain shares of the corporation. He does not herein appeal the trial court's finding against him on that issue.

[2]The other named defendants are Betty Hellwig (Hellwig's former wife who claims an interest in his share of Hudson), O'Hare International Bank and Citizens Bank and Trust Company (holders of Hudson's cash assets), and Sidney Frisch, Jr. (as sequestrator of the assets of Werner Hellwig). Only Hellwig and Hudson filed briefs in the instant appeal.

At the time of trial Hellwig owned approximately 60% of Hudson's stock and Coduti owned approximately 40%. Kurt owned one share of Hudson stock. Initially, the members of Hudson's board of directors were Hellwig, Coduti and James Southward. Upon his death, Southward was succeeded by Coduti's brother. Coduti's brother moved out of the area in 1977 and John Metropolos, a businessman and Hudson's insurance agent, became the third director. Thereafter, Hellwig and Coduti agreed to increase the board to five members and elected Kurt and Lorraine Allen, Coduti's daughter, as directors. Hellwig and Coduti later agreed to decrease the board to its present three members. At the time of trial the directors were Hellwig, Coduti and Kurt.

Hellwig has served as president since its incorporation; his responsibilities have been administrative in nature. Coduti has also served as an officer of Hudson; as an employee of the corporation he is principally responsible for supervising Hudson's production facilities. Neither Hellwig nor Coduti has ever accounted to each other for the hours they devote to business. Since the inception of the business it has been Coduti's practice to work many hours each week while Hellwig routinely spends long periods of time away from the plant, takes frequent vacations and long weekends, and spends several months each winter in Hawaii.

Salary adjustments for Hellwig and Coduti have over the years been effected without formal board action. In 1977 Hellwig voluntarily reduced his salary by 50% when, in his own judgment, he felt he was unable to continue at his previous level of performance because of personal pressures. He restored his salary to its former amount when he felt he was again working efficiently. The salaries and bonuses were paid to Hellwig and Coduti as follows:

|      | Hellwig | Coduti |
|------|---------|--------|
| 1974 | $36,200 | $43,900 |
| 1975 | 22,100  | 37,100  |
| 1976 | 15,300  | 55,100  |
| 1977 | 30,900  | 53,200  |
| 1978 | 29,900  | 57,900  |
| 1979 | 18,000  | 65,100  |
| 1980 | 17,100  | 47,100  |
| 1981 | 40,400  | 49,900  |

Hellwig's expense account, including country club payments, has been approximately $10,000 per year for the past four years. Coduti has an unlimited expense account and four weeks of vacation pay annually, in addition to 52 weeks of salary. All corporate officers have

had the use of cars owned or leased for them by Hudson. Although Coduti has pursued negotiations for such an agreement since 1977, the parties have never had a stock purchase agreement.

Since 1977 there have been a number of disputes between Hellwig and Coduti, culminating in the filing of the instant action wherein Coduti sought injunctive relief, dissolution or liquidation of Hudson, an accounting by certain defendants to Hudson, and imposition of a constructive trust concerning certain shares of Hudson stock owned by Hellwig or a declaratory judgment thereon. The trial court found all issues in favor of defendants and against Coduti, specifically, that there was no evidence of fraud, waste, mismanagement, illegality or oppression to warrant dissolution of the corporation and the liquidation of its assets and, further, that the evidence is insufficient to grant Coduti's request for accounting by the various defendants. Coduti appeals.

OPINION

The first issue is whether the trial court erred in refusing to order the dissolution of Hudson. The authority of courts to dissolve a corporation is statutory. (*Central Standard Life Insurance Co. v. Davis* (1957), 10 Ill. 2d 566, 572, 141 N.E.2d 45). Section 86 of the Illinois Business Corporation Act (Ill. Rev. Stat. 1983, ch. 32, par. 157.86) in relevant part provides:

"Circuit courts have full power to liquidate the assets and business of a corporation:

(a) in an action by a shareholder when it appears:

* * *

(3) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or

(4) That the corporate assets are being misapplied or wasted."

Where the above factors are positively shown shareholders are entitled to the protection of the law. Our supreme court has cautioned, however, that corporate dissolution is a drastic remedy that must not be lightly invoked. *Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 220-21, 170 N.E.2d 131.

Plaintiff Coduti contends, generally, that the findings of the trial court are against the manifest weight of the evidence. Our supreme court summarized the principles governing our consideration of this matter as follows:

"Concerning the manner of reviewing the findings of the trial court in a bench trial in which the evidence was conflicting, the

court in *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, said: 'Although a trial court's holding is always subject to review, this court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. [Citations.] Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion.' " (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110, 382 N.E.2d 1205.) With these principles in mind we turn to plaintiff's specific allegations of error.

In support of his contention that the trial court erred in refusing to order the dissolution of Hudson, plaintiff Coduti first argues that Hellwig's conduct has been and continues to be oppressive. In *Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 214-15, 170 N.E.2d 131, our supreme court stated:

"We have held that the word 'oppressive' as used in this statute, does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of 'mismanagement, or misapplication of assets,' does not prevent a finding that the conduct of the dominant directors or officers has been oppressive. It is not synonymous with 'illegal' and 'fraudulent.' *Central Standard Life Ins. Co. v. Davis,* 10 Ill. 2d 566."

A review of the case law discloses no single act which, by itself, will be deemed oppressive without consideration of the surrounding circumstances. In *Gray v. Hall* (1973), 10 Ill. App. 3d 1030, 1034, 295 N.E.2d 506, the court stated that "actions which might be oppressive under one set of circumstances would not be oppressive under others." Thus, each case claiming oppression as a basis for corporate dissolution must be determined solely upon its own facts. The court found no oppression where preferred stockholders alleged that they would reap no investment gain before the expiration of a 99-year corporate charter. (*Central Standard Life Insurance Co. v. Davis* (1957), 10 Ill. 2d 566, 141 N.E.2d 45.) An equal division of stock which resulted in a 10-year deadlock enabling the corporate president to control the corporation so as to deprive certain shareholders of their rights and privileges

as shareholders was, however, deemed oppressive. (*Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 170 N.E.2d 131.) A loan allegedly in consideration for a second mortgage was considered fraudulent and oppressive where the court found that no second mortgage was executed or ever existed. (*Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406.) An "arbitrary, overbearing and heavy-handed course of conduct" which included failure to call meetings of the board of directors or to consult with plaintiff regarding management, exhibiting "an imperious attitude when questioned about his salary," and responding to plaintiff's requests in a dilatory manner was also found to justify a finding of oppression. (*Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 499, 285 N.E.2d 574.) Finally, it has been held that the conspiratorial nature of certain actions which allegedly affected "an individual shareholder's control over corporate matters and the effective operation and profitability of the venture, coupled with alleged irregularity in the equity transfer, [met] the threshold of objectionable oppressiveness addressed by the statute and case law thereunder." *Notzke v. Art Gallery, Inc.* (1980), 84 Ill. App. 3d 294, 299, 405 N.E.2d 839.

In the instant case plaintiff Coduti cites numerous actions on the part of defendants which, he argues, fit within the concept of arbitrary, heavy-handed and overbearing conduct that has been found to constitute oppression of minority shareholders. (See *e.g., Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 285 N.E.2d 574.) We must, therefore, examine plaintiff's contentions in the context of the operation of the corporation and consider the circumstances surrounding the actions which form the basis of his complaint. Briefly, Coduti asserts that Hellwig engaged in the following conduct which he seeks to have characterized as oppressive: refusing to authorize dividends or bonuses when the corporation has large cash reserves; refusing to allow Coduti's attorney to be present at a director's meeting; holding director's meetings without notice to Coduti; causing Coduti to be arrested; and opening Coduti's mail and belittling him in the presence of others. We will consider the evidence regarding each of these actions in turn.

▪ Coduti first asserts that Hellwig's refusal to authorize bonuses or dividends while Hudson amassed large reserves constituted oppression. The decision concerning whether to declare a dividend where funds are available for such dividend rests within the discretion of the board of directors. Courts are reluctant to interfere with such decisions "unless the withholding is fraudulent, oppressive or totally without merit." (*Romanik v. Lurie Home Supply Center, Inc.* (1982), 105

Ill. App. 3d 1118, 1134, 435 N.E.2d 712.) The record here presented shows that Hudson paid bonuses in the following amounts in 1977, 1978 and 1979, respectively: Hellwig—$15,000, $5,000, $0; Coduti—$19,000, $19,000, $23,500; Kurt—$10,000, $10,000, $15,000. Frances and James Coduti, Jr., Coduti's children, also received "bonuses" of $3,000 each in 1977 and 1978 and James received $1,500 in 1976. The sums received by Coduti's children far exceeded the amounts they earned as part-time hourly workers at Hudson. At a board meeting in 1980 and again on May 28 and October 6, 1981, Hellwig proposed that bonuses be paid the officers of Hudson. Coduti did not agree and suggested at the 1980 meeting and at the May 1981 meeting that such payment be deferred until the close of the fiscal year. At the October 6, 1981, meeting of the board Hellwig recommended payment of a dividend and a resolution was passed by unanimous vote authorizing payment of a $50 per share dividend. No other dividend has ever been paid. Coduti did not recommend a larger dividend, nor has he ever presented a resolution that a dividend be declared.

■ It is not disputed that Hudson has accumulated a large cash reserve. Hudson has certificates of deposit in a total amount of approximately $775,000. Coduti testified that a reserve of $350,000 to $400,000 would be adequate for the type of business in which Hudson is engaged. Hellwig testified, however, that the accumulated reserve is required for the following business purposes: (1) to provide for continued existence of the corporation if its major account is lost; (2) to provide the liquidity needed in the present economic climate; (3) to provide for replacement of Hudson's machinery and equipment without incurring debt at current high interest rates; and (4) to provide for plant expansion as presently under consideration. Thomas E. Reyer, Hudson's accountant, also testified that such accumulation is good business practice considering the purposes specified for such reserves. Under these circumstances we are, therefore, unable to say that the trial court's finding that there was no oppression is against the manifest weight of the evidence. See *Gray v. Hall* (1973), 10 Ill. App. 3d 1030, 1035, 295 N.E.2d 506.

Coduti next catalogues various improprieties regarding meetings of the board of directors. He first raises the board's conduct in not allowing his attorney to remain in attendance at the board meeting on December 12, 1979. All five directors were present at that meeting. Only Coduti was represented by an attorney. A motion was passed to exclude attorneys from that particular meeting, whereupon Coduti and Allen left the meeting in protest. The three remaining directors constituted a quorum pursuant to Hudson's bylaws and they proceeded to

elect officers, including Coduti as treasurer.

Conduti also maintains that in January 1980 Hellwig consented to postpone a board meeting at Coduti's request, then held the meeting as originally scheduled. Conflicting testimony was presented on this matter. No minutes of such board meeting were produced, nor was there a record of any action taken by the board at such meeting.

■ Coduti next asserts that in May 1980, without notice to him, Hellwig called a special meeting of the board and, in Coduti's absence, obtained authorization from the board to draw checks with his signature alone, a departure from prior corporate policy which required that all checks carry both Hellwig's and Coduti's signatures. Coduti stated that his refusal to sign such checks, beginning at the end of April and continuing into the middle of May, was based upon his insistence that Hellwig sign the checks first, in accordance with long-standing corporate practice sanctioned by resolution of the board. Hellwig testified that he had requested that Coduti sign the checks first to indicate approval of the bills for payment, as Coduti had ordered the materials for which payment was being made. He admitted that on May 12, 1980, the board met in an emergency session and authorized Hellwig's single signature on checks written on the general operating account. He stated, however, that Coduti was not available for such meeting and that the board's action was necessitated by Coduti's refusal to sign any checks drawn on the general account which caused interference of cash flow to accounts payable and the payroll account for over 14 days. Coduti resumed signing checks when informed of the board's May 12 action. From the date of such action to the date of trial no check had been signed solely by Hellwig; Coduti does not contend that he or Hudson suffered any detriment as a result of the foregoing actions. Thus, the evidence supports the trial court's finding that there was no oppression regarding these matters.

Coduti next contends that Hellwig's causing him to be arrested was a form of oppression. On July 8, 1980, Hellwig delivered to Coduti a memorandum rescinding Coduti's authority to make bids and requiring that, henceforth, all quotations to customers were subject to Hellwig's written approval. Coduti testified that Hellwig swore at him and used a racial slur when delivering the memorandum. Hellwig denied swearing at Coduti and stated that his review of quotations was prompted by a 55% decline in business and was merely a part of his duties as president of Hudson. Coduti testified that Hudson was then experiencing a very profitable year. Coduti admitted, however, that upon delivery of the memorandum he lost control, shouted obscenities, and picked up a piece of copper and chased Hellwig into the plant. Co-

duti was arrested for aggravated assault, for which he was later acquitted. Hellwig issued a letter to Coduti discharging him due to such conduct. The board later reviewed the incident but took no vote to remove Coduti as an officer of the corporation. Coduti continued working and received his salary and vacation pay as before.

Finally, Coduti related the details of several incidents wherein he asserts that Hellwig belittled him in the presence of outsiders and consistently opened his mail. Hellwig admitted that he may have opened Coduti's mail by accident upon occasion, but denied belittling Coduti or engaging in any other petty conduct as claimed by Coduti.

Our review of the entire record in this case reveals conflicting testimony regarding each of Coduti's assertions. We must, therefore, defer to the determination of the trial court, which is uniquely situated to hear and weigh the evidence and whose findings will not be disturbed unless against the manifest weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 382 N.E.2d 1205.) A finding is against the manifest weight of the evidence only if, upon hearing such evidence, no reasonable person would reach the conclusion arrived at by the trial court. On the record here presented we cannot, therefore, state that the trial court's finding that there was no oppression of Coduti was against the manifest weight of the evidence.

■ In support of his contention that the trial court erred in refusing to order the dissolution of Hudson, Coduti next asserts that Hellwig has breached his fiduciary duty to Hudson and that such breach constitutes fraud. There is no general rule for determining whether certain acts constitute fraud; such determination depends upon the facts of each case (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99, 160 N.E.2d 783) and is therefore a matter peculiarly within the province of the trial court. The findings of the trial court will not be disturbed unless they are manifestly against the weight of the evidence. (*Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406.) In determining the fairness of a specific transaction particular emphasis is placed on such factors as whether the corporation to which the fiduciary duty is owed has received full value in the transaction, whether there was a detriment to the corporation resulting from the transaction, whether there was a possibility that corporate gain was siphoned off in favor of the fiduciary, and whether there was full disclosure—although even full disclosure and shareholder assent will not save an inherently unfair transaction. *Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 283, 166 N.E.2d 793.

■ Coduti argues that Hellwig has dealt unfairly with Hudson and

has profited thereby either directly or indirectly through Hollywood, a corporation under Hellwig's control. Specifically, Coduti maintains that Hellwig obtained personal benefit by causing Hudson to pay for the following: airline tickets for Hellwig and his friends; entertainment expenses unrelated to Hudson's business; personal items such as dry cleaning and gifts; automobile expense for Hellwig and Kurt when, allegedly, neither devoted substantial time or effort to Hudson; the cost of processing Hollywood's payroll and advancing sums to cover same without interest, for periods up to one month; double-billing Hudson for certain expenses; and putting Kurt on Hudson's payroll at full salary for little or no work. The following conflicting evidence was presented at trial regarding each of these items. Hellwig testified that travel, entertainment and other miscellaneous expenses were business-related. It is not disputed that Hudson pays automobile expenses for Hellwig and Kurt; Hudson also pays such expenses for Coduti. The trial court heard evidence that payment of such expense was a matter of corporate policy and also that Coduti allows his daughter and other family members personal use of his gasoline credit card, which charges are paid by Hudson. Hudson has processed Hollywood's payroll in connection with its own payroll for over 15 years. Hollywood has six employees, Hudson has over 40. Hudson's bookkeeper spends about one hour each week performing clerical tasks for Hollywood. Coduti alleges that Hudson allows Hollywood rent-free use of certain space at the Hudson facility. He later admitted that Hollywood utilizes about 10 square feet of Hudson's total 29,000 square feet. Evidence was presented that Hudson benefits from this arrangement because it has immediate access to Hollywood's inventory of die components stored there which are used by Hudson in its business operation. Such items can be obtained and used by Hudson, if needed, with no prior notice to Hollywood, thus benefiting Hudson. Evidence at trial showed that Hellwig had been reimbursed by Hudson for certain expenses which were initially paid for by Hudson. The amounts involved, however, were very small and can be considered insignificant in relation to the amount allowed Hellwig annually on his expense account. Hellwig testified that he had been unaware of the duplications until they were shown at trial and stated that he had reimbursed Hudson in full. Varying testimony was presented regarding the terms of Kurt's employment relative to his responsibilities, compensation and amount of work performed. Coduti testified that he had made no objection to granting Kurt a raise in February 1981. The court found that there was no evidence of fraud on the part of defendants to warrant dissolution of the corporation. The record here presented supports that finding. There

was no showing of detriment to the corporation or gain diverted from the corporation as a result of Hellwig's actions. By this we do not intimate that misconduct resulting in gain can be made right upon discovery merely by reimbursing the wronged party the amount of gain fraudulently acquired. (See, *e.g., Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 347, 264 N.E.2d 406.) We hold only that the trial court's finding is not against the manifest weight of the evidence.

Coduti also argues that Hellwig's financial dealings with Hudson have been illegal. He asserts that Hellwig's records regarding his business expenses may be insufficient to meet the requirements of the Internal Revenue Code and, further, that the retention of a substantial cash reserve by Hudson may be in violation of Internal Revenue Code provisions. (See 26 U.S.C. secs. 274(d), 531-35.) However, Coduti presents no evidence of any prosecution or investigation pending or threatened against defendants. His bold allegation that certain of defendant's actions "may well be" violations of the tax law is insufficient grounds for a finding of illegality on the part of defendants. The trial court's finding is, therefore, not against the manifest weight of the evidence.

■ Coduti also charges waste and misapplication of assets by Hellwig as grounds for dissolution. He asserts that Hellwig has built up large credit balances on his corporate charge cards and country club membership, both paid by Hudson, and maintains that such advance payments deprive Hudson of interest on its money. Coduti also asserts that Hellwig acted in a manner adverse to the best interests of Hudson by failing to contest the claim for unemployment insurance made by Anne Bernardi, a former secretary for Hudson. Regarding the latter charge, Hellwig testified that Hudson filed two written objections to Bernardi's claim. Thus, the trial court was presented with conflicting testimony on this point.

The manager of the Bob-o-Link Golf Club where Hudson maintains a membership for Hellwig testified that at Hellwig's request, he is billed in advance for his membership dues. Although not the usual method, he added that there are other members of the club who are billed in that manner. Hellwig testified that his decision to pay such fees in advance and to maintain credit balances on various charge accounts was to provide for the continuance of business-related entertaining should Hudson fall into a position where cash was not available for such expenditures. Thus, these appear to be matters of business judgment, within the responsibility of the board of directors and the officers of Hudson and "with which the court will not concern itself—

at least not in so far as they bear on the question of liquidation. (Bixler v. Summerfield 195 Ill 147, 150, 62 N.E. 849.)" (*Polikoff v. Dole & Clark Building Corp.* (1962), 37 Ill. App. 2d 29, 38, 184 N.E.2d 792.) Accordingly, we are unable to say that the trial court's finding that there was no waste or misapplication of corporate assets was against the manifest weight of the evidence.

In reviewing Coduti's assertions it is, we believe, important to keep in mind the context in which the events here complained of occurred, that is, within a corporate organization. Regarding such organization, our supreme court has stated:

> " 'It is, however, fundamental in the law of corporations, that the majority of its stockholders shall control the policy of the corporation, and regulate and govern the lawful exercise of its franchise and business *** Every one purchasing or subscribing for stock in a corporation impliedly agrees that he will be bound by the acts and proceedings done or sanctioned by a majority of the shareholders, or by the agents of the corporation duly chosen by such majority, within the scope of the powers conferred by the charter, and courts of equity will not undertake to control the policy or business methods of a corporation, although it may be seen that a wiser policy might be adopted and the business more successful if other methods were pursued. The majority of shares of its stock, or the agents by the holders thereof lawfully chosen, must be permitted to control the business of the corporation in their discretion, when not in violation of its charter or some public law, or corruptly and fraudulently subversive of the rights and interests of the corporation or of a shareholder.' (Wheeler v. Pullman Iron and Steel Co., 143 Ill. 197, 207, 32 N.E. 420; quoted with approval in Central Standard Life Ins. Co. v. Davis, 10 Ill App 2d 245, 250-51, 134 N.E.2d 653.)" *Polikoff v. Dole & Clark Building Corp.* (1962), 37 Ill. App. 2d 29, 35-36, 184 N.E.2d 792.

The record here does not support Coduti's contention that he has been deprived of his lawful right to participate in the management of Hudson. Rather, his complaints stem from his position as a minority shareholder and from personal disagreements with Hellwig, neither of which form a basis for the drastic remedy of corporate dissolution. The trial court found that plaintiff had not proved grounds for dissolution of Hudson, and we may not disturb such finding unless it is clearly against the manifest weight of the evidence. A finding is not against the manifest weight of the evidence merely because the record might support a contrary decision. (*Graham v. Mimms* (1982), 111 Ill. App.

3d 751, 767, 444 N.E.2d 549.) Accordingly, after review of the entire record, we conclude that the trial court's findings were not against the manifest weight of the evidence and the court, therefore, did not err in refusing to order the dissolution of Hudson.

■ The second issue is whether the court erred in refusing to order an accounting of the benefits which Coduti asserts were improperly received from Hudson by the other defendants. Coduti argues first that the trial court erred in assigning the burden of proof to Coduti and, second, that Hellwig did not satisfy his burden of proof. Coduti asserts that where an officer or director transacts business with a corporation the burden of proof is on the officer or director to show the fairness of the transaction by clear and convincing evidence. Thus, he maintains that, as the controlling shareholder of Hudson, Hellwig has a duty to show that any dealings he (or any entity in which he has an interest) has had with Hudson are fair and reasonable.

It is undisputed that the individuals in control of a corporation owe a fiduciary duty to such corporation and its shareholders. (*Schlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 278, 166 N.E.2d 793; *Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 761, 444 N.E.2d 549.) The duties imposed upon directors as fiduciaries require them to act with utmost good faith and loyalty in managing the corporation and thereby prohibit them from enhancing their own personal interests at the expense of corporate interests. (*Patient Care Services, S.C. v. Segal* (1975), 32 Ill. App. 3d 1021, 337 N.E.2d 471.) Where the discharge of this duty is challenged, the burden of demonstrating fairness rests on the fiduciary. (*Karris v. Water Tower Trust & Savings Bank* (1979), 72 Ill. App. 3d 339, 389 N.E.2d 1359; *Romanik v. Lurie Home Supply Center, Inc.* (1982), 105 Ill. App. 3d 1118, 435 N.E.2d 712.) It is not enough, however, to show merely that a fiduciary has entered into a transaction with the corporation to which he owes the duty of loyalty in order to shift the burden of proof. Rather, the one asserting the breach of the duty of loyalty must first establish that the fiduciary profited from the transaction. *Karris v. Water Tower Trust & Savings Bank* (1979), 72 Ill. App. 3d 339, 389 N.E.2d 1359.

Coduti's argument that the trial court erred in assigning him the burden of proof is based solely upon the single statement of the trial court that "Plaintiff's evidence *** bears the burden." This is, of course, correct as it related to the claim for dissolution and to other matters not here on appeal. The court, however, was aware that the burden of proof may shift. When Coduti's attorney argued that in certain situations the burden shifts to the fiduciary the court expressed such awareness by stating: "That will be conceded by everyone. You

have to raise some inference of wrongdoing for the burden to shift." The order entering judgment in this cause stated that the court had considered prior case decisions relevant hereto and the arguments of counsel. We are, therefore, unpursuaded by Coduti's assertion that the court erred in assigning him the burden of proof. Neither are we persuaded that, once the burden shifted to the fiduciary as to the accounting, Hellwig did not satisfy his burden. The record discloses that he presented evidence concerning each of Coduti's contentions and the trial court made its findings based upon such evidence. Coduti presents no argument, other than his dissatisfaction with the decision, which rejects his contention that Hellwig failed in his burden of proof. The trial court here correctly applied the burden of proof and found that Hellwig satisfied his burden. We may not reverse the finding unless it is against the manifest weight of the evidence. After a full review of the voluminous record here presented, we are convinced that it supports the finding of the court.

For all the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

LORENZ and SULLIVAN,* JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

PRESIDING JUSTICE MEJDA delivered the opinion of the court:

■ Plaintiff has petitioned for a rehearing and that this cause be remanded to the circuit court for consideration under section 12.55 of the Business Corporation Act of 1983, which became effective July 1, 1984 (Ill. Rev. Stat., 1983 Supp., ch. 32, par. 12.55). The petition alleges that the Act, which became effective during the pendency of this appeal, replaced the 1933 Business Corporation Act (Ill. Rev. Stat. 1983, ch. 32, pars. 157.1 to 157.167) and contains a new provision for alternative remedies to judicial dissolution of a corporation, specifically section 12.55. The new section in pertinent part is as follows:

"Sec. 12.55. Alternative remedies to judicial dissolution.

(a) In either an action for dissolution pursuant to Section 12.50 or in an action which alleges the grounds for dissolution set forth in Section 12.50 but which does not seek dissolution, the Circuit Court, in lieu of dismissing the action or ordering

---

*Justice Wilson, who participated at oral arguments, has since died. Justice Sullivan has reviewed the briefs, record and the tape of the oral arguments.

dissolution, may retain jurisdiction and:
(1) Appoint a provisional director;
(2) Appoint a custodian; or
(3) In an action by a shareholder, order a purchase of the complaining shareholder's shares as provided in subsections (f) and (g) below."

From the statutory language it is apparent that the new section contemplates only an alternative remedy, rather than a distinct action. Consequently, the right to that remedy depends upon proof of all of the elements which would have entitled a party to a judicial dissolution, because the action must be either for dissolution or must allege the same grounds for dissolution as set forth in section 12.50 (Ill. Rev. Stat., 1983 Supp., ch. 32, par. 12.50). The trial court, however, has already found that defendants in the instant case have not acted with oppression, fraud or illegality and that corporate assets were not being misapplied or wasted. We have heretofore determined that those findings were within the evidence. It follows therefrom that plaintiff has not proved his cause of action under section 12.50 and thus has not established his right to any remedy under the law. Accordingly, he is not entitled to the alternative remedy of a forced purchase of his shares. The petition for rehearing is therefore denied.

LORENZ and SULLIVAN, JJ., concur.