TIMOTHY J. SCHIRMER, Plaintiff-Appellant, v. WILLIAM F. BEAR *et al.*, Defendants-Appellees.

Second District    No. 2—94—0425

Opinion filed April 7, 1995.

William E. Schirger and David F. Monteleone, both of William E. Schirger & Associates, of Rockford, for appellant.

John S. Lowry, of Brassfield, Cowan & Howard, of Rockford, for appellees.

JUSTICE HUTCHINSON delivered the opinion of the court:

This appeal arose out of a suit filed by plaintiff, Timothy Schirmer, against defendants, William F. Bear, William R. Bear Agency, Inc., and Lawrence Peck, seeking dissolution of defendant corporation (the Agency). In the alternative, plaintiff sought an order directing the Agency to buy plaintiff's shares from him.

After a bench trial, on December 16, 1993, the trial court filed a memorandum opinion denying plaintiff's prayer for dissolution of the Agency. While the trial court found that plaintiff failed to prove grounds for judicial dissolution under the Business Corporation Act of 1983 (Act) (805 ILCS 5/12.50 (West 1992)), it did find that "[r]emoval of the plaintiff as a corporate director and officer was obviously illegal, but the record is devoid of any evidence that the plaintiff was damaged thereby." The trial court also ruled that plaintiff was entitled to the alternative relief (see 805 ILCS 5/12.55 (West 1992)) of requiring the Agency to purchase his shares. The trial court then sought to reconvene the matter for initiation of an appraisal process in order to determine the amount plaintiff should be paid for his shares.

On January 28, 1994, defendant William F. Bear (Bear) filed a motion to reconsider the trial court's order that the plaintiff's shares be purchased. The trial court granted defendant's motion. On March 14, 1994, the trial court entered an order stating that "plaintiff has failed to prove the grounds for dissolution." The trial court also refused to order that the Agency purchase plaintiff's shares. The trial court reasoned that plaintiff's failure to prove grounds for judicial dissolution precluded him from being entitled to alternative relief. We disagree; we reverse and remand.

The Agency was incorporated in 1979, and in that year Bear purchased 250 shares in the Agency. Bear's parents retained the remaining 750 shares, for a total of 1,000 shares. On May 1, 1982, Bear's parents entered into an agreement to sell 231 of their shares. Of these 231 shares, 44 were sold to Bear; the other 187 shares were sold to plaintiff. The agreement to sell 187 shares to plaintiff required

a $10,000 down payment with the balance to be paid in monthly installments. The agreement also gave plaintiff an option to purchase an additional 53 shares at $410 per share "upon such terms and conditions as shall be agreed upon at the time of purchase." On May 1, 1982, Bear's parents also made an agreement to sell their remaining shares (519) back to the Agency. For these 519 shares, the Agency made monthly payments totalling over $200,000. Both plaintiff and Bear guaranteed payment for these shares "individually, jointly and severally." After Bear's parents sold their remaining shares back to the Agency, Bear owned 61.1% of the outstanding shares (294 shares) while plaintiff owned 38.9% (187 shares).

From May 1, 1982, until July 1990 plaintiff and Bear got along well. During that same period of time, the Agency's gross annual commissions from its insurance business rose from $180,653 to $285,000. On July 2, 1990, Mr. and Mrs. Bear's stock was paid off in full and retired as treasury stock. At that same time, plaintiff paid in full his contract to purchase 187 shares. There was also an annual shareholders' meeting held on July 2, 1990, at which time a board of directors was elected for a term of one year. This board consisted of Bear, Lawrence Peck, and plaintiff. At this meeting, Bear made a motion which plaintiff seconded to continue with the buy-sell agreement "until such time [as a] new Buy-Sell Contract is completed between William F. Bear and Timothy J. Schirmer." Bear also moved and plaintiff seconded a motion that the Agency be valued at $500,000.

On July 18, 1990, plaintiff wrote Bear expressing his intention to exercise his option to purchase the additional 53 shares of stock. In his letter, plaintiff enclosed a proposed payment plan for the purchase of the additional 53 shares. The terms of this proposed payment plan were as follows: "open ended with payment amounts and payment dates left to the discretion of the buyer." Two days later, Bear met with plaintiff and refused his offer to purchase the shares; Bear did not make a counteroffer. Bear also informed plaintiff that he had closed the books of the Agency.

Bear testified that the decision to close the books of the Agency and not to declare a profit for the officers was made early in July 1990. Bear testified that this decision was made because (1) the Agency was considering the installation of computers and (2) the landlord had given notice that the Agency might be required to move. The Agency later spent about $30,000 for computers and furniture. Bear also testified that he did not receive any bonus money in 1990, 1991, 1992 and 1993.

On August 10, 1990, plaintiff wrote Bear a letter which stated in

part: "The withholding of the profits for year end 6-30-90 was not in the best interest of the stockholders." The letter went on to state that Bear had spent Agency funds for family memberships to the YMCA, a dinner sponsored by the Kiwanis Club, tickets to a show and payments made to his brother-in-law for an insured fire loss. Lastly, plaintiff's letter set forth two options "for the betterment of each of us and for the betterment of the agency." The first option was that the Agency pay plaintiff $195,000, which represented 39% of the $500,000 Agency valuation established at the July 1990 meeting, and that plaintiff would terminate his employment relationship with the Agency. The second option was the same as the first except that plaintiff would stay on as an employee with an annual salary (equal to Bear's) of $66,000 plus benefits.

On August 11, 1990, Bear wrote a letter to plaintiff stating: "The terms and conditions of your letter dated August 10, 1990, are not acceptable to me." The letter went on to advise plaintiff to have his attorney contact Bear's attorney (Whiton). Coincidentally, Whiton is also corporate counsel to the Agency and his bill is paid with Agency funds.

On August 20, 1990, Bear notified plaintiff of an annual directors' meeting to be held on August 30, 1990. This communication does not contain any notice of an intention to (1) amend the corporate bylaws, (2) reduce the size of the board of directors, (3) eliminate cumulative voting rights, or (4) call a shareholders' meeting.

On August 27, 1990, Whiton, authorized by Bear, wrote plaintiff a letter which stated: "your letter of August 10, 1990, is deemed a resignation. On August 30, 1990, this resignation will be accepted effective September 15, 1990, unless you choose to terminate Agency employment prior to September 15." The letter went on to reject plaintiff's offer to sell his shares in the Agency for $195,000. However, the letter did offer to purchase plaintiff's shares for $76,670. This amount was taken from the buy-sell agreement of May 1, 1982, which stated that if plaintiff resigned or was discharged for his conduct, Bear's parents had the right to acquire plaintiff's shares for the principal price of $76,670. Whiton's letter also stated that if plaintiff refused to sell his shares for $76,670, he "could be holding the shares for quite some time as a minority shareholder in the Agency without any other involvement as officer, director, or employee."

On August 30, 1990, the board of directors' meeting was held and attended by plaintiff, Bear, William R. Bear, Lawrence Peck, and Whiton. At this meeting, Bear moved to amend the bylaws to reduce the number of directors from three to one. Bear also moved to appoint new officers of the Agency. Bear nominated himself as sole

director. As sole director, Bear made his wife secretary of the Agency while making himself both president and treasurer. Bear also removed plaintiff's name from all corporate bank accounts. Bear voted his shares in favor of his motions while plaintiff voted his shares against the motions. As a result, these measures were approved by only 61.1% of the shareholders.

During the meeting on August 30, 1990, plaintiff and Whiton discussed whether plaintiff's letter dated August 10, 1990, was a resignation. Whiton commented that "it did not make much difference whether it was in fact a resignation, Bear and the Agency interpreted the letter to mean that Bear and Schirmer could no longer work together. The same result would follow: Schirmer's employment relationship with the Agency, would end." Bear set plaintiff's termination date for September 15, 1990, and offered him $76,670 for his shares.

On September 4, 1990, plaintiff's attorney (Schirger) wrote Bear a letter stating that "it is not the intention of Mr. Schirmer to resign his position with William R. Bear Agency." Whiton responded to Schirger in a letter dated September 10, 1990, as follows: "Whether or not Mr. Schirmer (and you) deny that [the August 10, 1990, letter] is a resignation is irrelevant. If it is not a resignation, then Mr. Bear, as [the] majority shareholder, officer, and director, would and did terminate Mr. Schirmer as an employee effective September 15, 1990."

On September 17, 1990, Bear wrote to the Agency's insurance company in order to inform it that plaintiff "is no longer an employee of the [Agency]." Bear terminated plaintiff's medical insurance, group hospitalization, employment benefits and life insurance. He also changed the locks to the Agency and packed up plaintiff's personal belongings, put them in a box, and asked plaintiff to pick them up. Since plaintiff's termination, he has not received a bonus or other form of compensation from the Agency.

In October 1990, Bear's wife, Denise, was put on the payroll of the Agency. At the end of 1990, she was paid approximately $2,200 for three months' work. In January 1991 she began receiving an annual salary of $24,000. Bear testified that Denise was hired because, at that time, she was the only one in the office with computer experience. In April 1991 Bear purchased a used 1988 BMW automobile for approximately $18,000 using the Agency's funds. Although the Agency had not purchased automobiles in the past, Bear testified that the car was purchased as a company car. Bear also testified that the car was purchased on the advice of his accountant who said that the depreciation on the car would be a good business deduction.

From August 30, 1990, until June 27, 1991, there were no corporate communications between the Agency and plaintiff. On December 7, 1990, plaintiff filed this suit. On June 27, 1991, Bear informed plaintiff of an annual stockholders' meeting to be held on July 8, 1991. Plaintiff attended this meeting, and Bear testified that plaintiff was made a director at that time. However, plaintiff testified that "to be honest, [he was] not sure if [he] was [elected as a director] or not." Although plaintiff received notice of the annual stockholders' and directors' meeting in 1992, he was unable to attend. Plaintiff was also unable to attend the 1993 annual stockholders' and directors' meeting because of a job conflict.

■ Plaintiff argues that under section 12.50(b)(2) of the Act the Agency may be dissolved in an action by a shareholder, if it can be established that "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive or fraudulent." (805 ILCS 5/12.50(b)(2) (West 1992).) Plaintiff contends that Bear's actions were within the statutory meaning of the word "oppressive" and, as a result, the trial court erred when it refused to dissolve the Agency. We find this argument to be unpersuasive.

In *Central Standard Life Insurance Co. v. Davis* (1957), 10 Ill. 2d 566, the supreme court interpreted "oppressive" as found in the statute as follows: "The word 'oppressive' does not carry an essential inference of imminent disaster; it can, we think, contemplate a continuing course of conduct." (*Central Standard Life Insurance Co.*, 10 Ill. 2d at 573.) The court went on to reject the argument that the word "oppressive" is substantially synonymous with the words "illegal" and "fraudulent." The court also stated that "[m]isapplication of assets or mismanagement of funds are not, as we read the statute, indispensable ingredients of 'oppressive' conduct." (*Central Standard Life Insurance Co.*, 10 Ill. 2d at 574.) Furthermore, a reviewing court has stated "[a] review of the case law discloses no single act which, by itself, will be deemed oppressive without consideration of the surrounding circumstances." (*Coduti v. Hellwig* (1984), 127 Ill. App. 3d 279, 284.) In *Notzke v. The Art Gallery, Inc.* (1980), 84 Ill. App. 3d 294, the court found that " 'an arbitrary, overbearing and heavy-handed course of conduct' " justified a finding of oppression. (*Notzke*, 84 Ill. App. 3d at 299, quoting *Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 499.) In *Notzke*, the court also stated that "actions which might not be oppressive under one set of circumstances would be oppressive under others." (*Notzke*, 84 Ill. App. 3d at 300.) Finally, in 1960 the supreme court acknowledged that "[c]orporate dissolution is a drastic remedy that must not be lightly invoked.

[Citation.] Nevertheless, when oppression is positively shown, the oppressed are entitled to the protection of the law." *Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 220-21.

■ The record supports the trial court's finding that Bear acted illegally in removing plaintiff from the board of directors. First, the Agency's bylaws state that "[t]he number of directors may be increased or decreased from time to time by the amendment of this section; but no decrease shall have the effect of shortening the term of any incumbent director." Bear's actions clearly shortened plaintiff's term as a director. Second, the notice of the 1990 annual directors' meeting was deceptive. This notice, dated August 20, 1990, did not apprise plaintiff of (1) the purpose of the meeting, or (2) the various actions Bear planned to take at the meeting. Although this court recognizes that notice was proper if this meeting was truly a directors' meeting, we feel that the actions taken at the meeting more closely resemble a special shareholders' meeting. Notwithstanding the issue of waiver, a special shareholders' meeting requires appropriate notice of the purpose of the meeting. (See 805 ILCS 5/7.15 (West 1992).) It is also likely that the approval of Bear's motions at the August 30, 1990, meeting was also defective. At the meeting, Bear's motions were approved by 61.1% of the shareholders. Under the Act, unless the articles of incorporation or the bylaws specify otherwise, some or all of the actions Bear took at the meeting fall short of the requisite two-thirds majority of the shareholders. (See 805 ILCS 5/2.10(b)(2)(v) (West 1992).) Unfortunately, the record does not contain a complete set of the articles or bylaws. Finally, the timing of all these circumstances is questionable in light of the recent completion of the stock purchase agreements and the closing of the corporate books.

■ The decision to judicially dissolve a corporation is discretionary. (805 ILCS 5/12.50 (West 1992).) In the present case, the trial court heard the evidence and found that while Bear had acted improperly, plaintiff had failed to prove grounds for dissolution. "[A] reviewing court will not substitute its judgment for that of the trial court unless it is against the manifest weight of the evidence." *Arians v. Larkin Bank* (1993), 253 Ill. App. 3d 1037, 1041.

■ The trial court's decision not to dissolve the Agency finds support in the business judgment rule. The business judgment rule accords great deference to corporate business decisions by not holding corporate officers or directors liable for mere mistakes or errors of judgment. (*Selcke v. Bove* (1994), 258 Ill. App. 3d 932, 935.) In the present case, the business judgment rule could be used to explain Bear's decisions (1) not to distribute a bonus, (2) to purchase a BMW

company car, (3) to purchase memberships from the YMCA (Bear testified that the YMCA had a large account with the Agency), and (4) to put his wife on the payroll. In light of the discretionary language of section 12.50 and the business judgment rule, we are unprepared to say that the trial court's decision was against the manifest weight of the evidence.

Plaintiff also argues that the trial court erred in granting Bear's motion to reconsider. Plaintiff urges this court to reject the language in *Coduti,* which states that if a plaintiff does not prove his cause of action under section 12.50, "he is not entitled to the alternative remedy of a forced purchase of his shares" under section 12.55. (*Coduti,* 127 Ill. App. 3d at 294.) Plaintiff reasons that the plain meaning of section 12.55 does not require, as a condition precedent to relief, proof of grounds for dissolution. Plaintiff further urges that even if the trial court does not find grounds for dissolution, the trial court still retains the discretion to order an alternative remedy under section 12.55.

In *Belfield v. Coop* (1956), 8 Ill. 2d 293, 307, the Illinois Supreme Court stated:

> "The only legitimate function of the courts is to declare and enforce the law as enacted by the legislature, to interpret the language used by the legislature where it requires interpretation, and not to annex new provisions or substitute different ones, or read into a statute exceptions, limitations, or conditions which depart from its plain meaning."

The operative statute provides:

> "In either an action for dissolution pursuant to Section 12.50 or in an action which alleges the grounds for dissolution set forth in Section 12.50 but which does not seek dissolution, the Circuit Court, in lieu of dismissing the action or ordering dissolution, may retain jurisdiction and:
>
> * * *
>
> (3) In an action by a shareholder, order a purchase of the complaining shareholder's shares as provided in subsections (f) and (g) below." (805 ILCS 5/12.55(a)(3) (West 1992).)

Subsection (f) empowers the court to order the purchase of the complaining shareholder's shares "at any time during the pendency of the action and upon the motion of the complaining shareholder." (805 ILCS 5/12.55(f) (West 1992).) Subsection (g) states that any shareholder may, "any time after the filing of an action for dissolution pursuant to subsection (b) of Section 12.50 [action for judicial dissolution by a shareholder], petition the court to purchase the shares of a complaining shareholder." (805 ILCS 5/12.55(g) (West 1992).) We determine that the plain meaning of the statute does not

require proof of grounds for dissolution before making alternative remedies available.

According to the unambiguous language of the statute, there are two categories of actions which trigger the availability of alternative remedies. The first category is "an action for dissolution pursuant to Section 12.50." (805 ILCS 5/12.55(a) (West 1992).) The second category encompasses an action which alleges "the grounds for dissolution set forth in Section 12.50 but which does not seek dissolution." 805 ILCS 5/12.55(a) (West 1992).

■ In the present case, plaintiff filed an action for dissolution pursuant to section 12.50. The trial court found that plaintiff failed to prove grounds for dissolution, but the trial court also found that plaintiff's removal from the board of directors was illegal. Even though the trial court found no evidence that plaintiff was damaged by his removal from the board of directors, the trial court did choose to order that the Agency purchase plaintiff's shares. The discretionary decision to order the purchase of plaintiff's shares was permitted under the plain meaning of the statute as the statute provides "in lieu of dismissing the action or ordering dissolution" the trial court has the discretion to order the purchase of plaintiff's shares. 805 ILCS 5/12.55(a) (West 1992).

The clear language of the statute compels us to find that the trial court's decision to grant defendant's motion to reconsider was an error of law. While recognizing that the trial court was bound to rely on *Coduti*, we disagree with that court's interpretation of section 12.55. Furthermore, a review of the *Coduti* case reveals that no request was made for a purchase of stock. In *Coduti*, the plaintiff sought dissolution and "an accounting of allegedly improper benefits received from the corporation by its controlling shareholder." (*Coduti*, 127 Ill. App. 3d at 281.) Since we have determined that the plain meaning of the statute does not require grounds for dissolution to be proven before making alternative remedies available, and because of the divergent fact patterns of *Coduti* and the present case, *Coduti* is not here controlling. Therefore, we determine that the trial court erred when it relied on *Coduti* to hold that grounds for dissolution must exist before alternative remedies may be applied.

Our present holding is consistent with a more recent analysis of this statutory authority in *Kimmel v. Wirtz* (N.D. Ill. 1992), 793 F. Supp. 818. *Kimmel* held that section 12.55 provides "such independent relief as long as the plaintiff makes the appropriate allegations." (*Kimmel*, 793 F. Supp. at 820.) A careful review of the pleadings reveals the appropriate allegations, and the findings based upon the proofs have already been identified. Furthermore, we are not

persuaded that the August 10, 1990, letter amounted to plaintiff's resignation or that this letter taken together with plaintiff's employment performance and conduct established grounds for plaintiff's termination by Bear. It is also unreasonable to expect plaintiff or this court to accept that $76,670 is a fair price for plaintiff's shares. Section 12.55(f) gives the trial court discretion to determine value and set a payment schedule in various ways and after consideration of all relevant facts. (See 805 ILCS 5/12.55(f) (West 1992).) On remand, the trial court shall reconvene the hearing to determine a fair price for the shares in a manner consistent with the guidelines of this authority.

We also believe that our decision is consistent with the general design of the Business Corporation Act of 1983. This decision recognizes that shareholders in a small corporation have a limited marketplace in which to sell their shares. It also recognizes that section 12.55 was enacted in order to provide a reasonable alternative to the drastic remedy of judicial dissolution.

For the above reasons, we affirm the trial court's decision not to dissolve the corporation, we reverse the trial court's decision refusing to order the corporation to purchase plaintiff's shares, and remand this cause for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

McLAREN, P.J., and THOMAS, J., concur.