GERALD NOTZKE, Plaintiff-Appellee and Cross-Appellant, *v.* THE ART GALLERY, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

Third District   No. 79-51

Opinion filed May 21, 1980.

Dean B. Rhoads, of Sutkowski & Washkuhn Associates, of Peoria, for appellants.

Robert L. Metzler, of Pekin, for appellee.

Mr. JUSTICE STOUDER delivered the opinion of the court:

Plaintiff Gerald Notzke commenced this action in the circuit court of Tazewell County against defendants Richard Lewis, Ronald Hild, and The Art Gallery, Inc., seeking specific performance of a restrictive

buy-sell agreement, damages stemming from the breach of that agreement and the breach of an employment contract, and liquidation of the corporation. The trial court considered evidence concerning the employment contract and the appropriateness of corporate liquidation at a bench trial and entered judgment for defendants on the former issue. After the expiration of a three-month period granted for the purchase of plaintiff's shares in the corporation, the court ordered its liquidation. Defendants appeal the order of liquidation and plaintiff cross-appeals the judgment concerning the employment contract.

Something of the history of the corporate venture is essential to an understanding of the various contentions at bar. In 1971, plaintiff began negotiating with Northwoods Mall, a Peoria shopping center, concerning the construction of a cocktail lounge, subsequently named The Art Gallery. Unable to procure a lease for lack of sufficient assets to obtain the necessary financing, plaintiff ultimately solicited defendants Lewis and Hild for investment in the venture. In March 1974, the defendant corporation was organized with plaintiff, Lewis, and Hild each receiving one-third of the corporation's 6,000 shares in exchange for a $15,000 contribution to capital. Each of the shareholders was elected a director of the corporation and plaintiff was selected as its president. In January 1975, the corporation borrowed $52,000 to finance construction of the lounge, and each shareholder pledged substantially all of his assets as security for this loan. As neither Lewis nor Hild had experience in the construction or operation of such a facility, plaintiff both designed the lounge and, with Hild, supervised its construction. Lewis and Hild were pleased with plaintiff's efforts and the board adopted a resolution in May 1975 that he be paid $5,000 at an undetermined time in the future. The bonus had not been paid at the time of trial.

The Art Gallery opened for business in April 1975 under the management of plaintiff and defendant Hild. Plaintiff had previously managed similar facilities and, while Hild had no such experience, he tended bar and maintained certain records. In June 1975, plaintiff and Hild began to have disputes concerning the operation of the lounge, including disagreements involving the supervision of employees. At this time, defendant Lewis was inactive in the management of the business and was informed of the escalating problems between plaintiff and Hild by corporate counsel William Morris. Later that month, Lewis delivered a set of written recommendations to plaintiff and Hild regarding corporate administration. Among Lewis' recommendations were that plaintiff terminate his employment with Caterpillar Tractor Company and assume a position as full-time manager of the lounge while Hild be relieved of managerial responsibility and further his business education to facilitate corporate expansion.

After the delivery of defendant Lewis' recommendations, the board of directors held two meetings to consider the proposals. It appears that defendant Hild desired to assume full-time management of the facility, but early in July the board adopted a resolution appointing plaintiff to the position. Later that month plaintiff assumed the position of full-time manager of the business at a salary of $400 per week and left his position with Caterpillar Tractor Company. There was a conflict of testimony at trial as to whether plaintiff was assured of the managerial position as long as he was effective in that capacity. Hild was to maintain the corporate records and observe the operation of the lounge so that he might in the future manage a second facility.

In October 1975, defendants Lewis and Hild indicated they desired to sell their holdings in the corporation. Lewis thereafter wrote plaintiff indicating he had found an outside party willing to purchase his interest for $20,000. Hild had stated he desired $30,000 for his shares and in November 1975, he also indicated he had located an outside purchaser. Plaintiff offered Lewis approximately $18,370 and indicated he would be willing to buy either party out but could not purchase both of their holdings simultaneously. Plaintiff also offered to exchange a property for Lewis' interest. None of the above transfers came to pass and Lewis ultimately sold his 2,000 shares to Hild for $30,000, payable in 60 monthly payments of $622. Plaintiff was never offered an installment purchase arrangement, and the actual transfer of shares had apparently not transpired at the time of trial, although Hild was authorized to vote Lewis' shares by proxy.

On December 25, 1975, plaintiff wrote a corporate check to himself for $2,250 and on December 28, 1975, wrote himself a second check for $2,650. There was a conflict of testimony at trial regarding the authorization of these payments. Plaintiff testified he was "running a little bit scared" and Lewis had previously told him he would receive half of his $5,000 if the venture showed a certain profit. While thus explaining one check, he was unable to recall the purpose of the other. Subsequent to the writing of the two checks, payment was stopped by Hild, who had removed the corporate records from the lounge. On December 30, 1975, it was determined that plaintiff was to continue as The Art Gallery's manager but that Hild, now the controlling stockholder, would have sole power to receive and disburse funds, hire and fire employees, and generally manage the corporation.

On January 18, 1976, Gregory Brown, a corporate employee, tended bar at the club until approximately 6 p.m., when he was relieved by plaintiff. Brown, who had begun to work for the corporation a month earlier, testified that approximately $207 of business had been conducted that afternoon and the following evening he reported this figure to Hild,

who subsequently responded that the figure amounted to the approximate proceeds for the entire day. Hild testified that upon confronting plaintiff with this information, plaintiff stated: "Ron, didn't you ever get into the cash register when you worked?" Hild testified that he felt no obligation to keep an employee who was stealing from him and terminated plaintiff's employment with the corporation, although he conceded on cross-examination the evidence of the alleged theft was inconclusive. Plaintiff's version of his termination was considerably different. He testified that Hild told him they "just couldn't see eye-to-eye" and that "he no longer needed me." Plaintiff went on to explain that Hild stated that he now had control of the corporation and therefore he was terminating plaintiff as club manager. When plaintiff thereafter refused to leave the premises, plaintiff testified that Hild grabbed and threatened him with physical violence, and he has since been completely barred from the lounge. Plaintiff additionally denied removing any money from the cash register and likewise denied asking Hild if he had ever done so.

There is some indication that plaintiff may have closed the club shortly after Brown left that evening but Brown and Hild testified that, to their knowledge, the cocktail lounge had never closed before midnight and Hild stated plaintiff was to have kept the club open until 1 a.m. the following morning. Hild thereafter managed the club at a salary of $500 per week and plaintiff testified Hild could not otherwise have met his monthly obligation to Lewis.

Plaintiff attended a meeting of the board of directors in March 1976, but, although he received a notice, he did not attend the April 1976 meeting when new corporate directors were elected. He thus forfeited the opportunity to elect himself to the board, and Hild was subsequently elected president of the corporation. When plaintiff contacted the corporate accountants concerning his W-2 form for that year, his response was a letter from Hild stating all contact with the accountants was to be through him. Plaintiff received notice of the 1977 shareholders meeting but did not elect to attend.

At the time of trial before the circuit court, plaintiff's complaint contained three counts, and no error is assigned to the trial court's dismissal of count II, praying for damages for breach of the buy-sell agreement. As the parties stipulated that the stock in the corporation originally held by defendants Lewis and Hild would not be transferred pending the outcome of the litigation, the trial court determined not to hear evidence pertaining to count I, praying for specific performance of the buy-sell agreement. Having denied defendants' motion to dismiss count IV, praying for corporate liquidation, the bench trial proceeded on that count and count III, praying for damages for breach of the

employment contract. By *nunc pro tunc* order the court found for plaintiff on count IV and granted defendant three months to purchase plaintiff's interest in the corporation for one-third of the corporate net worth and payment of the $5,000 bonus. As defendants failed to exercise their option, the court found for defendants on count I, to which no error is assigned, and on count IV, appointing a receiver with authority to liquidate the corporation.

On appeal, defendants contend the trial court erred in denying the motion to dismiss the corporate liquidation count of the complaint and that its ultimate decision to liquidate the corporation is contrary to the manifest weight of the evidence. Plaintiff contends these rulings were correct but that the court erred in refusing to admit the buy-sell agreement and that its determination of the breach of employment contract count is contrary to the manifest weight of the evidence.

Count IV of plaintiff's second amended complaint sought liquidation of the corporation pursuant to section 86(a)(3) of the Business Corporation Act (Ill. Rev. Stat. 1977, ch. 32, par. 157.86(a)(3)), which provides:

> "Circuit courts have full power to liquidate the assets and business of a corporation:
>
> (a) In an action by a shareholder when it appears:
>
> * * *
>
> (3) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent."

As we must accept all properly pleaded facts as true and are concerned only with the question of law presented by the pleadings in determining the propriety of the ruling on the motion to dismiss (*e.g., Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538), we first consider the allegations of the relevant count.

The allegations of count IV are in large part reallegations of a conspiracy between defendants Lewis and Hild as alleged in the first counts of the second amended complaint. The complaint maintains that plaintiff was deprived of his position in the corporation, his share of corporate control, and his managerial employment as a result of this conspiratorial course of conduct. Plaintiff contends this represents oppressiveness under the statute.

In *Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 214-15, 170 N.E.2d 131, 135, the court stated:

> "We have held that the word 'oppressive' as used in this statute, does not carry an essential inference of imminent disaster; it can contemplate a continuing course of conduct. The word does not necessarily savor of fraud, and the absence of 'mismanagement, or misapplication of assets,' does not prevent a finding that the

conduct of the dominant directors or officers has been oppressive. It is not synonymous with 'illegal' and 'fraudulent.' Central Standard Life Ins. Co. v. Davis, 10 Ill. 2d 566."

The concept of oppressiveness as a ground for corporate liquidation has been available to shareholders since 1933 (see *Central Standard Life Insurance Co. v. Davis* (1957), 10 Ill. 2d 566, 141 N.E.2d 45, 49), but neither the litigants nor our research have revealed an authoritative determination of its precise scope. In *Central Standard Life Insurance Co. v. Davis*, the alleged inability of preferred stockholders to reap investment gain before the expiration of a 99-year corporate charter was not deemed oppressive. In *Gidwitz v. Lanzit Corrugated Box Co.*, an equal division of stock enabling the corporate president to control the corporation so as to deprive plaintiff's family of their rights and privileges, coupled with the lack of policy-making board meetings and other facts, was considered oppressive. In *Ross v. 311 North Central Avenue Building Corp.* (1970), 130 Ill. App. 2d 336, 264 N.E.2d 406, a loan allegedly in consideration for a second mortgage which was never produced was considered both fraudulent and oppressive. In *Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 285 N.E.2d 574, 581, the court found "an arbitrary, overbearing and heavy-handed course of conduct", including the failure to call board meetings, to consult with plaintiff, maintaining an "imperious attitude when questioned about his salary," and reacting to plaintiff's requests in a dilatory fashion, justified a finding of oppression. In *Gray v. Hall* (1973), 10 Ill. App. 3d 1030, 1034, 295 N.E.2d 506, 509, the court remanded a liquidation action for an accounting as "actions which might be oppressive under one set of circumstances would not be oppressive under others."

■■ Considering the parameters of oppressiveness established in our decisional law, we feel the complaint at bar alleged a course of conduct which was "overbearing and heavy-handed." Conspiratorial action allegedly affecting an individual shareholder's control over corporate matters and the effective operation and profitability of the venture, coupled with alleged irregularity in the equity transfer, meet the threshold of objectionable oppressiveness addressed by the statute and case law thereunder. Defendants' contention that none of the alleged acts are oppressive as they are premised on plaintiff being "demoted" to a minority shareholder overlooks the characterization of this process as a conspiratorial ploy. We therefore find no error in the trial court's denial of defendant's motion to dismiss the subject count.

■■ Finding the trial court correctly denied the motion to dismiss, we next consider whether its decision to liquidate the corporation is against the manifest weight of the evidence. As the judgment of that court was

not accompanied by any findings of fact, we must presume that all controverted facts were found in plaintiff's favor. *E.g., Tolbird v. Howard* (1969), 43 Ill. 2d 357, 253 N.E.2d 444.

Firmly supported by the record is the fact that plaintiff and defendant Hild suffered a continuing and escalating deterioration of their business relationship beginning within two months of the Art Gallery becoming an operational reality. Given the above presumption, the predominant cause of the deteriorating relationship was Hild's desire to operate the lounge according to his personal judgment. When the corporate conflict reached the level that prompted defendant Lewis' recommendations, it is clear that Hild sought the managerial appointment awarded to plaintiff. Within three months of that appointment, Lewis and Hild both desired to sell their corporate holdings but offered their interests to plaintiff on terms which made the acquisitions impossible. Thereafter, Lewis sold his stock to Hild, accepting a five-year installment agreement as consideration. In January 1976, Hild discharged the plaintiff, accusing him of theft. Plaintiff disputed the charge of theft, both at the time of his discharge and during the trial. Not only did Hild claim the plaintiff was discharged for theft, he thereafter continued to act and believe as if the plaintiff were a thief even though no criminal charges were ever brought. Hild became the new club manager at a salary of $500 per week, enabling him to meet his newly acquired debt service. Plaintiff was physically intimidated and barred from the facility, and was not even allowed to communicate with the corporate accountant.

■■ We are aware that corporate liquidation is a drastic remedy. (See, *e.g., Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 170 N.E.2d 131, 138.) Yet we are similarly aware that actions which might not be oppressive under one set of circumstances would be oppressive under others. (*Gray v. Hall* (1973), 10 Ill. App. 3d 1030, 295 N.E.2d 506.). Where, as here, a director and officer of a corporation has accused another director of dishonesty and continues to act on the premise that the accusation is true, not only is such conduct oppressive, it also permeates all of the business relations between the parties. We do not find, under the circumstances here present, that the trial court's conclusion is manifestly erroneous.

Plaintiff contends the trial court erred in not admitting a copy of the shareholder's buy-sell agreement into evidence. As we have found the trial court's decision is not against the manifest weight of evidence, we need not reach the several contentions advanced by the parties concerning this evidentiary ruling.

The final question presented for our determination is whether the trial court's decision concerning count III of plaintiff's complaint, praying for damages for breach of the employment contract, is contrary to the

manifest weight of the evidence. Plaintiff argues he terminated his employment as a research director and development manager with Caterpillar Tractor Company in reliance on the terms of an oral or implied employment agreement providing that he remain as manager of The Art Gallery as long as the corporation existed and that he successfully performed his managerial function. Defendants deny the existence of any such agreement and contend alternatively that plaintiff was not successfully performing his managerial function in that he was uncooperative, dissenting, and dishonest within the scope of his employment. The weight to be given testimony is a matter to be determined by the trial court sitting without a jury, and its findings will not be disturbed unless manifestly erroneous. (*E. g., People ex rel. Penrod v. Chicago & North Western Ry. Co.* (1959), 17 Ill. 2d 307, 161 N.E.2d 126.) Considering the conflicting evidence previously set forth, we find the trial court's decision is not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Tazewell County is affirmed.

Affirmed.

STENGEL and SCOTT, JJ., concur.