EDWARD RONWIN, Plaintiff-Appellant, *v.* PIPER, JAFFRAY & HOPWOOD, INC., *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 82—1588

Opinion filed March 29, 1983.

Edward Ronwin, of Urbandale, Iowa, for appellant, *pro se.*

Judith A. Rogosheske and James M. Odland, both of Drake & Larson, P.A., of Minneapolis, Minnesota, and Michael A. Reiter, of Katten, Muchin, Zavis, Pearl & Galler, of Chicago, for appellee Piper, Jaffray & Hopwood, Inc.

William F. Conlon and David F. Johnson, both of Sidley & Austin, of Chicago, for other appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Edward Ronwin, appeals from the dismissal of his complaint against defendants Piper, Jaffray & Hopwood, Inc. (hereinafter Piper), George C. McKann, Paul M. Steinbrink, Paul W. Fairchild (hereinafter the panel or the arbitrators), and the New York Stock Exchange (hereinafter N.Y.S.E.).

Ronwin, who possessed a juris doctorate in law and an advanced degree in biochemistry, attributed his substantial losses in the com-

modities market to Piper. He and Piper agreed to submit his claim to arbitration. After a lengthy hearing, conducted under the auspices of the N.Y.S.E., Ronwin's claim was denied. Thereafter, Ronwin filed a complaint in the circuit court of Cook County seeking to have the arbitrators' decision vacated. The complaint was dismissed. Ronwin appeals. We affirm.

At the arbitration hearings, Ronwin testified that he had acquired a substantial amount of stock which he later sold for approximately $81,000. He learned of the $13,000 tax consequences on the sale and asked Robert Westlund, general manager of Piper's Des Moines, Iowa office, if the $81,000 could be used to generate the $13,000 tax payment he would have to make. Westlund suggested gold futures and bond futures markets. He told Ronwin that as interest rates went down the price of bond futures would go up; the price of gold would "bottom out" at $550; and bond futures would bottom at $65. None of these predictions proved to be correct.

At his request, Westlund spoke with one of Piper's more experienced commodities brokers who was "cautiously optimistic" about the bond futures market. Ronwin relied upon this man's opinion, but continued to suffer substantial losses. He had authorized Piper to withdraw money from his money market account to cover these losses, but complained that because these withdrawals were sometimes not recorded until a day after they were made he was given a "false picture" of the magnitude of his losses.

On cross-examination, Ronwin admitted that he had read, signed and received a copy of a commodity account agreement and risk disclosure statement prepared by Piper which explained that commodities trading involved a very high degree of risk. He also admitted that he kept a running log of all the transactions he entered into, that he knew that he had lost approximately $4,000 in his first two gold futures trades, but explained, "It's like a drug. You get high ***." Ronwin then rested.

Piper called Westlund, who testified that after two weeks of consideration and three or four telephone conversations, Ronwin expressed the desire to trade in the commodities market. Ronwin came in to sign the commodity account agreement and risk disclosure statement, which Westlund asked him to read or, at least, take with him to read at his leisure. Westlund explained the market requirements and trading limits in the gold futures market to Ronwin, and the volatility of the market. Westlund then suggested they not rush into the gold futures market, but wait until the time was right, and even then buy only one gold contract. It was never his intention that Ronwin trade

in a large number of contracts.

When the price of Ronwin's original contract dropped, Westlund suggested that Ronwin either stay in and hope that the price would rise or sell out and take the loss, but Ronwin insisted upon "spreading his position." Ronwin suffered a later loss and Westlund suggested that they take the loss and get out of the market; however, Ronwin insisted upon staying in and trying to get his money back.

Ronwin began trading in the bond futures market. Westlund told Ronwin that he was becoming overexposed, but Ronwin refused to take a more conservative position because he was convinced that both markets would improve dramatically in the near future. Often, when Westlund was out to lunch, Ronwin would call and direct another broker in the office to buy or sell for him. Westlund would learn of the transaction only later that afternoon.

Ronwin knew exactly how much money he had in his money market account because Westlund had one of his assistants calculate what his balance was for him daily after Ronwin had informed him that his (Westlund's) secretary had given him an incorrect total one day. After Ronwin had suffered substantial losses in both markets, he asked Westlund to lend him enough money to allow him to continue trading on the exchange. Westlund responded that he did not have that much money and that, even if he had, his lending it to Ronwin would be illegal. Shortly thereafter Ronwin closed his accounts with Piper. After Ronwin had cross-examined Westlund, Piper rested.

The arbitrators denied Ronwin's claim. Ronwin then filed a *pro se* complaint in the circuit court of Cook County alleging that he was an actively practicing Iowa attorney, seeking to have the arbitrators' award vacated and the dispute re-tried by the court. Piper, the arbitrators and the N.Y.S.E. filed motions to strike and dismiss the complaint pursuant to sections 45 and 48 of the Illinois Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, pars. 45, 48), now sections 2—615 and 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, pars. 2—615, 2—619). After considering the memoranda submitted and oral arguments made by the respective parties, the circuit court granted defendants' motions to dismiss.

I

Ronwin first contends that the arbitrators' award should be vacated because Piper, through its agent, Robert Westlund, induced him to trade on the commodities market and then concealed the size and number of his losses in that market in violation of public policy of the United States and Illinois, which is "to substitute a philosophy of full

disclosure for one of caveat emptor and to thereby protect the investing public against the sharp practices of promoters whether or not such practices meet the requirements of common-law fraud." (*Norville v. Alton Bigtop Restaurant, Inc.* (1974), 22 Ill. App. 3d 273, 281, 317 N.E.2d 384.) Although not specifically mentioned as a ground upon which an arbitrator's award may be vacated in section 12(a) of the Uniform Arbitration Act (Ill. Rev. Stat. 1979, ch. 10, par. 112(a)), public policy in general has been recognized as an additional ground upon which an arbitrator's award may be vacated. *Board of Trustees v. Cook County College Teachers Union, Local 1600* (1979), 74 Ill. 2d 412, 386 N.E.2d 47.

■ Neither the judgment of the circuit court nor the arbitrators' award were accompanied by findings of fact. All controverted facts and issues therefore must be presumed as having been resolved in favor of the prevailing party. (*Wood v. Price* (1868), 46 Ill. 435; *National Acceptance Co. of America v. Pintura Corp.* (1981), 94 Ill. App. 3d 703, 707, 418 N.E.2d 1114; *Notzke v. Art Gallery, Inc.* (1980), 84 Ill. App. 3d 294, 299-300, 405 N.E.2d 839.) Among these presumptive findings are that Piper neither induced Ronwin to enter the commodity market nor concealed from him the size and number of his losses. The record supports such a presumptive finding. We find no violation of public policy under these circumstances.

## II

■ Ronwin next argues that on two occasions the arbitrators "countenanced" and thereby became parties to Piper's fraud. The first such alleged "countenance" was the panel's acceptance of a "doctored" copy of Ronwin's account card which indicated that he was an experienced trader. Ronwin contends that the card clearly had been altered shortly before the hearing; however, Westlund explained that the card was current and was updated after Ronwin had already bought and sold several gold contracts, at which point Ronwin was considered an experienced trader. The second allegedly "countenanced" fraud was when the panel ignored Piper's "lie" in its answer to Ronwin's claim. Ronwin had asserted that Westlund had "induced" him to enter the commodities market, which Piper's answer denied. At the hearing, Westlund acknowledged that he had suggested that Ronwin enter the market, but explained that Ronwin discussed the idea with him on three or four occasions. Ronwin told him two or three weeks later that he was interested in getting into the market. The arbitrators were made the triers of fact by agreement of the parties. Judicial review of an arbitrator's award is more limited than ap-

pellate review of a trial court's determination. (*Garver v. Ferguson* (1979), 76 Ill. 2d 1, 8, 389 N.E.2d 1181.) As the United States Supreme Court observed, cited and quoted with approval in *Garver* (76 Ill. 2d 1, 9):

> " 'Arbitrators are judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes it should receive every encouragement from courts of equity. If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error either in law or fact. A contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation.' (*Burchell v. Marsh* (1854), 58 U.S. (17 How.) 344, 349, 15 L. Ed. 96, 99.)"

The arbitrators here apparently found Westlund's testimony more credible than Ronwin's. We find no basis upon which to disturb their findings.

## III

■ Ronwin next asserts that the arbitrators were biased against him as manifested in a number of ways: First, Piper's conduct clearly violated public policy, yet the panel did not rule in his favor, which raises a "healthy" inference of bias on their part in and of itself. We have earlier in this opinion found no such violation. Second, Steinbrink, one of the arbitrators, allegedly demonstrated his bias by "leaping" to Westlund's aid at one point in the proceeding. The record, however, reflects that at that point, Steinbrink was simply attempting to clarify, as much for Ronwin's benefit as the panel's, when Westlund had updated Ronwin's account. Third, another arbitrator, McKann, manifested his bias on two occasions, once when McKann prevented Ronwin from cross-examining Westlund as to what he meant by the words "experienced trader." The record reflects that Westlund explained what he meant by these words, that Ronwin acknowledged that he had, but continued to pursue the matter until McKann indicated that the question had been answered and suggested that Ronwin proceed with his next question. The next occasion was when counsel disputed to whom a denial in Piper's answer to Ronwin's claim might be attributed—Ronwin claiming that it should be attributed to Westlund as well as Piper. At that point, McKann interjected, "Let's not get far afield. Let's stick with the redirect please." Al-

leged bias must be shown with clear and convincing evidence, not that which is remote, uncertain or speculative. (*Saville International, Inc. v. Galanti Group, Inc.* (1982), 107 Ill. App. 3d 799, 800, 438 N.E.2d 509.) The alleged instances of bias are neither clear nor convincing. They instead demonstrate consideration and attentiveness to both parties.

## IV

Ronwin next identifies certain circuit court errors. One of these allegedly occurred when the court refused to recognize public policy as a permissible ground upon which to vacate the award. At the commencement of the hearing on defendants' motions to dismiss Ronwin's complaint, the court made clear that it believed public policy was a valid ground upon which to vacate, stating, in effect, that an arbitration award may be vacated if it violates public policy as well as for any of the specific reasons set out in section 112(a) of the Arbitration Act.

■ Ronwin contends that the circuit court erred in dismissing that part of his complaint which alleges that the N.Y.S.E. uses the arbitration proceedings to protect its members from having to pay money awards to which claimants like himself are rightfully entitled. The record bears no support for such an accusation. A court has inherent power to protect itself from frivolous and vexatious litigation. (*Patterson v. Northern Trust Co.* (1919), 286 Ill. 564, 567, 122 N.E. 55.) The circuit court here properly dismissed this portion of Ronwin's complaint as well.

■ Finally, error is claimed in the circuit court's denial of attorney fees to Ronwin because of defendant's alleged bad faith in presenting doctored evidence to the panel and in filing false pleadings before the circuit court. Neither contention is substantiated by the record. The circuit court in its discretion properly denied attorney fees to Ronwin under this state of facts. *Village of Evergreen Park v. Spangler* (1976), 40 Ill. App. 3d 947, 949, 353 N.E.2d 257.

For the foregoing reasons, we affirm the order of the circuit court dismissing Ronwin's complaint.

Affirmed.

DOWNING, P.J., and STAMOS, J., concur.