CHRISTEL HAGER-FREEMAN *et al.*, Plaintiffs-Appellants, v. CARL SPIRCOFF *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—90—1987

Opinion filed May 7, 1992.—Rehearing denied June 3, 1992.

Wiczer & Associates, Chartered, of Northbrook (Fred L. Berkovits, of counsel), for appellants.

John O. Tuohy, of Chicago, for appellees.

JUSTICE LINN delivered the opinion of the court:

Plaintiffs, Christel Hager-Freeman and Walter O. Freeman, filed a multiple-count action against Carl Spircoff, William O'Keefe, and Show-Biz Home Video, Inc., an Illinois corporation (Show-Biz). Chris-

tel and Carl, along with Charles DiCaro, were the three shareholders of the corporation formed to operate a video rental store. O'Keefe was the lawyer for Show-Biz. The controversy pending before the court arose from a transaction in which Charles sold his shares to Carl alone, instead of jointly to Carl and Christel as allegedly intended. According to Christel, she and Carl had agreed to jointly purchase Charles' shares, and to that end both deposited $5,000 with O'Keefe, as partial payment for the shares. O'Keefe allegedly assured her that he could handle the transaction for both parties and that she need not consult her own counsel. Without Christel's knowledge, and with the help of O'Keefe, Carl purchased Charles' shares in his own name and took over control of the business, locking out Christel and denying her access to the books and records. Christel's employment with Show-Biz was terminated. She filed suit against Carl and O'Keefe, seeking various forms of equitable relief.

All but two counts of the second amended complaint have been dismissed, with prejudice, for failure to state causes of action. Plaintiffs' appeal is limited to the dismissal of counts III and VII, which may be described, respectively, as a claim against attorney O'Keefe for breach of a duty sounding in agency and a shareholder action against defendants Carl and Show-Biz for oppression. Counts IV and VI survived the motion to dismiss, but plaintiffs withdrew them, for purposes of the appeal, with leave to reinstate. Before we can consider the legal sufficiency of counts III and VII, however, we must unravel and resolve the jurisdictional matters.

The record in this case is daunting, filled with innumerable motions and briefing schedules. The complaint was amended twice, answered, and subjected to repeated motions to dismiss. Both sides sought summary judgment as to some counts. The trial court denied summary judgment but then dismissed certain counts with prejudice and let other counts stand. The procedural history leading up to the two orders is convoluted and confusing. The appellate briefs do not, unfortunately, dispel the confusion that has been generated by the years of pleadings battles.

JURISDICTIONAL BACKGROUND

Plaintiffs filed their notice of appeal on July 10, 1990, seeking review of an order entered on June 12, 1990. The June 12 order denied plaintiffs' motion to reconsider an earlier order (March 13, 1990) that dismissed with prejudice counts III and VII of the second amended complaint. The June 12 order also granted defendants' motion to strike plaintiffs' motion to reconsider the dismissal of those counts.

Counts IV and VI were stricken with leave to reinstate. The June 12 order contains a finding under Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) that the decision to deny plaintiffs' motion to reconsider and to grant defendants' motion to strike the motion to reconsider was a final and appealable order.

In the earlier order of March 13, 1990, the trial court had dismissed count III (against attorney O'Keefe) with prejudice and entered a finding pursuant to Supreme Court Rule 304(a) that there was no just reason to delay enforcement of or appeal from that ruling. The March 13 order also dismissed count VII with prejudice but at the same time granted plaintiffs leave to file their brief in support of count VII, in the form of a motion to reconsider. Count VII may be referred to as the "shareholder oppression" claim. The court in the March 13 order denied defendants' motion to dismiss counts IV and VI. Count IV challenges Carl's wrongful refusal to allow Christel her shareholder's right to inspect the books and records of Show-Biz. Count VI sounds in constructive trust and seeks to impose an equitable lien on one-half of the shares of the business, based on Carl's alleged fraudulent misrepresentations.

In one other development that occurred after entry of the June 12 order appealed from, Carl moved for attorney fees pursuant to section 2—611 of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—611.) This motion was filed on July 11, 1990, one day after plaintiffs filed their timely notice of appeal. According to defendants, Carl's motion for attorney fees divested the appellate court of jurisdiction under the original notice of appeal. Carl contends that because plaintiffs failed to refile their notice of appeal after the disposition of the fee motion, pursuant to Supreme Court Rule 303(a)(2), this court lacks jurisdiction over this appeal.

OPINION

I

In their initial brief, filed in December 1990, plaintiffs asserted that the June 12 order was final and appealable under Supreme Court Rules 301 and 303. Thereafter, the appeal was dismissed on defendants' motion. Plaintiffs moved to reinstate the appeal and filed an additional or amended statement of jurisdiction, premised on Supreme Court Rule 304(a). This court then reinstated the appeal. Subsequently, defendants filed their appellee briefs. (Carl Spircoff and Show-Biz Home Video, Inc., filed one brief, and attorney William

O'Keefe filed a separate brief.) Defendants' briefs both challenge this court's jurisdiction.

Carl's brief asserts that the plaintiffs failed to properly perfect this appeal because after the notice of appeal was filed the trial court ruled on what Carl terms a "post-trial" motion, his motion for attorney fees under section 2—611 of the Code of Civil Procedure. Under Supreme Court Rule 303(a)(2), when post-trial motions are filed, either before or after a notice of appeal is filed, the notice of appeal has no effect and must be withdrawn by the appellant by moving for dismissal of the notice of appeal pursuant to Supreme Court Rule 309. After the post-trial motion is ruled upon, the appellant must then refile the notice of appeal. Plaintiffs did not refile their notice of appeal after the fee motion was determined, and Carl maintains that this divests the court of appellate jurisdiction.

O'Keefe joins in this argument, but makes additional challenges. He contends that plaintiffs have *waived* jurisdictional arguments under Supreme Court Rule 304(a) because the statement of jurisdiction in plaintiffs' opening brief relies on Supreme Court Rules 301 and 303. Those rules involve appeals from judgments that are final and appealable as to all matters, without a special finding. Notwithstanding the waiver argument, O'Keefe claims that the June 12 order *did* finally dispose of all matters on that date (despite the express finding under Supreme Court Rule 304(a)), because the plaintiffs had voluntarily dismissed the two remaining counts of their complaint, and there was nothing left to be determined at that point. O'Keefe thereby maintains that jurisdiction would have been proper under Rules 301 and 303 but that plaintiffs have *abandoned* this base of jurisdiction by relying on Rule 304(a) (which he claims they have waived in any event.

This court admits to lingering confusion over the exact jurisdictional arguments being joined in this appeal, as the above attempt to summarize defendants' positions indicates. We can state with certainty, however, that the only possible basis for this court's jurisdiction is Supreme Court Rule 304(a), because the March 13 and June 12 order clearly show that not all counts of the second amended complaint were finally put to rest. In the June 12 order, counts IV and VI were dismissed without prejudice and with leave to reinstate. Those two counts survived the motion to dismiss, but the transcript of the hearing indicates that plaintiffs were allowed to put them "in abeyance" by withdrawing them without prejudice and with leave to reinstate. The apparent purpose of this procedure was to facilitate appellate review by fashioning a final disposition of the lawsuit. (We note

the fallacy in such an approach, however, as the June 12 order could not be made final as to all claims by the simple device of dismissing viable counts with leave to reinstate.) In any event, both the March 13 and June 12 orders determine "fewer than all the rights and liabilities in issue or fewer than all of the matters involved in the case." (*Getzelman v. Koehler* (1958), 14 Ill. 2d 396, 400, 152 N.E.2d 833, 835.) Accordingly, our jurisdiction over this appeal can only be premised on Supreme Court Rule 304(a). (E.g., *Marsh v. Evangelical Covenant Church* (1990), 138 Ill. 2d 458, 563 N.E.2d 459.) To come within this provision, the order appealed from must contain the trial court's express finding that there is no just reason to delay enforcement of or appeal from the ruling. In the pending case the orders appealed from do contain such a finding, but that is only the beginning of the inquiry into this court's authority to hear this appeal.[1]

PROCEDURAL HISTORY

To straighten the strands of the jurisdictional tangle, we believe it may be useful to first examine the nature of the controversy, to better understand which counts were dismissed at what point and for what reasons. Massive motion practice occurred in the years after the initial filing and that has contributed to the current confusion over the appealability of the orders on appeal.

A simplified summary of the operative facts would include the key allegation that Carl purposefully deceived Christel over the stock pur-

---

[1] In retrospect, we believe that it would have been preferable for the trial court to refuse to enter the Rule 304(a) finding. Where, as here, there is a core group of operative facts from which the various legal theories arise, allowing an interlocutory appeal from some of the counts does not promote judicial economy. Here, the conduct complained of in each count began with the secretive stock purchase transaction that Christel characterizes as a breach of Carl's fiduciary duty. That transaction forms the basis of the constructive trust count against Carl, which has not been adjudicated, as well as the agency-by-estoppel against O'Keefe, which has been dismissed with prejudice. Those counts, IV and III, set out common law theories based on shared facts. Carl's alleged trickery in obtaining the shares also gave rise to the statutory claims of counts VI and VII, both of which arise from the wrongful actions Carl allegedly engaged in once he took over as majority shareholder. The court allowed count VI, the claim based on the denial of Christel's written demand for access to the corporate books and records, but dismissed count VII, which alleged a series of specific instances of related, and more serious, actions. Accordingly, we do not find this case one that is well served by interlocutory appeal under Rule 304(a). We decline to dismiss the appeal on that basis, however, since the orders appealed from do contain the trial court's final disposition of counts III and VII and plaintiffs maintain that those counts are critical to their lawsuit.

chase arrangement and thereafter used his majority shareholder position to take over complete control of the business, terminate Christel's employment, and deny her access to the corporate books and records. He is also alleged to have forgiven a corporate debt of $20,000, without Christel's knowledge or approval, thereby diminishing the corporate assets. The trial court noted that the alleged agreement between Christel and Carl to buy Charles' stock was in the nature of a joint venture. Ultimately, the court sustained count IV of the complaint, which seeks a constructive trust on one-half of the shares of stock Carl purchased from Charles. The other count that withstood summary disposition, count VI, involves Carl's alleged failure to permit Christel access to the corporate books and records, thus denying her a significant right as a minority shareholder. Plaintiffs seek an accounting and the dissolution of the business, among other relief.

As against the corporation's attorney, plaintiffs allege that O'Keefe made knowingly false representations and assurances to Christel, that she need not consult another lawyer regarding the contemplated joint purchase of Charles' one-third share of the stock. O'Keefe accepted her initial payment of $5,000 to put toward the purchase. He purportedly assured her he would handle the stock purchase on behalf of her and Carl, but then drafted a purchase agreement by which Carl took all of Charles' stock in his name alone. Plaintiffs apparently seek to hold O'Keefe liable under an agency-by-estoppel theory.

INJUNCTION PROCEEDINGS

The record reveals that in August 1987 the trial court granted certain temporary injunctive relief to maintain the status quo pending further court proceedings. Shortly thereafter, Carl answered the original seven-count complaint and raised *laches* as an affirmative defense. O'Keefe also filed an answer, generally denying the allegations directed at him.

In October 1987, after a hearing, the court held that plaintiffs had failed to sustain their burden for a preliminary injunction. The court's order, however, left in effect certain restraints on defendants, barring the concealment of corporate assets or disposal of assets in other than the usual course of business. Carl was granted the right to change the locks on the business and make other business decisions, but was enjoined from interfering with the rights of Christel as "at least a minority shareholder." Plaintiffs were given "some form of access to the books and records" and the case was given a short date for status.

Following the preliminary injunction hearing, further battles were joined, such as a skirmish over the Federal income tax return and allegations of impropriety regarding the keeping of the corporate records. The record on appeal contains substantial paperwork relating to motions for sanctions filed by both sides. While these various disputes are not directly relevant to this appeal, they demonstrate that nothing in this case proceeded equably or with much efficiency.

AMENDED COMPLAINT; MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

Carl filed a motion for summary judgment in September 1988. Plaintiffs took defendants' depositions before the motion was heard, and on November 7, 1988, plaintiffs were given leave to file a first amended complaint, over defendants' objections. Carl filed a motion to strike and dismiss the first amended complaint, although he also filed an answer. Although it is not clear in the record, apparently Carl's pending motion for summary judgment on the original complaint was then treated as a motion for summary judgment as to certain counts of the first amended complaint. Plaintiffs filed a countermotion for summary judgment. Defendants' motion to dismiss and both sides' motions for partial summary judgment were heard together.

By order entered March 23, 1989, the court granted defendants' motion to dismiss certain counts of the first amended complaint, with prejudice: count I ("Oppression," alleging Carl's freeze out of Christel); count II ("Breach of Fiduciary Duty By Director," naming Carl and O'Keefe); and count V ("Refusal to Transfer Shares"). The court denied the motion to dismiss, however, as to count III ("Breach of Fiduciary Duty By Attorney"); count IV ("Refusal To Permit Examination of Records (Carl)); count VI ("Constructive Trust On Corporate Shares" (Carl)); and count VII ("Dissolution By Reason of Deadlock"). Defendants' motion for summary judgment as to counts IV, VI, and VII was denied, and the motion for summary judgment as to count III was continued for later ruling. Plaintiffs' countermotion for summary judgment was denied. The order also granted time for filing additional responses.

Defendant Carl then moved the court to reconsider its denial of his motion to dismiss counts IV, VI, and VII and yet another briefing schedule was entered. In an order entered on June 26, 1989, the court struck those three counts of the amended complaint, along with count III, and granted leave to amend.

SECOND AMENDED COMPLAINT; SECTION 2—615 AND SECTION 2—619
MOTIONS TO DISMISS

The second amended complaint was filed, on August 7, 1989, in four counts. These counts were then renumbered to correspond to the numbering of the earlier complaint, so the second amended complaint actually consists only of counts III, IV, VI, and VII. This corrected version of the second amended complaint was filed in January 1990. It is this "second" second amended complaint that is, finally, the subject of this appeal.

Carl next filed a motion to dismiss plaintiffs' entire action pursuant to section 2—619 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—619), generally alleging the affirmative defense of unclean hands. This motion was based on an assertion that Christel had kept two sets of books for Show-Biz Video. Plaintiffs countered with a motion for sanctions, and the court found that Carl had filed a false affidavit regarding his lack of knowledge of Christel's bookkeeping methods. After another flurry of motions for sanctions— on both sides—the court entered an order on December 7, 1989, in which it denied Carl's motion to dismiss pursuant to the unclean hands doctrine.

THE MARCH 13 AND JUNE 12, 1990, ORDERS APPEALED FROM

The last round of motions in this case led to the dismissal of counts III and VII, with prejudice. Count III, which asserted a claim against O'Keefe based on his alleged breach of fiduciary duty to the shareholders of Show-Biz, was dismissed with prejudice in the March 13, 1990, order. The court noted that the attorney's duty was to the corporation and that plaintiffs failed to plead an adequate basis for holding him liable. In adding the Rule 304(a) language to its order, the court finally disposed of this count. The court also dismissed count VII with prejudice, the shareholder oppression count, but in that order expressly granted plaintiffs leave to file, as a motion to reconsider, their cases in support of their legal theory and in opposition to the motion to dismiss.[2]

---

[2]The transcript reveals that while plaintiffs had briefed the oppression theory and cited cases in an earlier response, they had not refiled a formal response to this latest motion to dismiss count VII. The court stated that it did not believe the count stated a cause of action and dismissed it with prejudice at that time; however, the court simultaneously granted plaintiffs leave to brief the issue in a future motion to reconsider.

At the June 12 hearing the court granted defendants' motions to *strike* the motion to reconsider the earlier dismissal of counts III and VII, presumably because plaintiffs raised no new evidence. The court also *denied* plaintiffs' motion to reconsider.[3] The parties and the court discussed the appealability of the June 12 order and the court acknowledged that "it is hard to understand count 7 unless you understand the other [pending] counts." Plaintiffs argued that if they could not proceed on count VII, they probably would not go to trial on the two remaining counts because they would be unable to get appropriate relief. Based on this representation, the trial court agreed to strike counts IV and VI, without prejudice, apparently as a means by which the appellate court could review the legal sufficiency of counts III and VII before the remaining claims proceeded to trial.

We conclude that the entry of the June 12 order, while final as to the trial court's disposition of counts III and VII, was not final as to counts IV and VI, which had been stricken with leave to reinstate. The order on its face demonstrates its lack of finality as to two counts. Accordingly, the only way for this court to obtain appellate jurisdiction was for the trial court to enter the special finding under Supreme Court Rule 304(a), which it did.

Defendants, however, persist in treating the June 12 order as one that finally disposed of the entire litigation.

DID THE FILING OF THE FEE PETITION NULLIFY THE NOTICE OF APPEAL?

■■ Carl's challenge to our jurisdiction is based on the argument that the June 12 order was, in substance, a final disposition of all claims under Supreme Court Rules 301 and 303. As such, he contends that it was subject to the provision of Supreme Court Rule 303(a)(2), which states as follows:

---

[3]We do not believe it is appropriate to strike a motion and deny it at the same time. Apparently, the defendants attacked the legal sufficiency of the motion to reconsider because it did not raise new material but instead reargued the original matters raised in the motion to dismiss. We do not agree that parties are limited to raising entirely new material in motions to reconsider, as it is proper to argue that the court misapplied the cited law or misunderstood key facts. In this case, moreover, the trial court expressly granted plaintiffs at the March 13 hearing the right to file their brief in opposition to the motion to dismiss as their motion to reconsider, at least with respect to count VII. Accordingly, we view as surplusage the striking of plaintiffs' motion to reconsider and hold that it does not bear on the appealability of the orders in question.

"[When a timely post-trial motion is filed by any party], a notice of appeal filed before the entry of the order disposing of the last pending post-trial motion shall have no effect and shall be withdrawn by the party who filed it ***. This is so whether the timely post-trial motion was filed before or after the date on which the notice of appeal was filed. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the post-trial motion ***." (134 Ill. 2d R. 303(a)(2).)

Under Carl's reasoning, the July 10 notice of appeal is null and void because Carl filed a motion for attorney fee sanctions on July 11, within 30 days of the June 12 order. Plaintiffs did not refile the notice of appeal following the disposition of his fee motion.

■ Carl's conclusion—if not his analysis—would be accurate if the June 12 order lacked the Rule 304(a) finding and instead was a final judgment as to which a proper post-trial motion was directed. To explain why that is so we must explore another aspect of the law of appealability.

In *Marsh v. Evangelical Covenant Church* (1990), 138 Ill. 2d 458, 563 N.E.2d 459, the Illinois Supreme Court defined "post-trial motions" and explained how the filing of a fee petition after entry of a judgment tolls the appealability of that judgment. First the court cited the language and construction given to section 2—1203 of the Illinois Code of Civil Procedure. That section provides that in nonjury cases, a party may file post-trial motions within 30 days of judgment "for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1203.) The court in *Marsh* held that for a fee petition to qualify as a true post-trial motion, one directed at the judgment as contemplated in section 2—1203, it must be an integral part of the relief requested in the judgment. Thus, for example, if a mortgage agreement included an attorney fee provision and a party requesting fees as part of his recovery was denied fees in the judgment, a subsequent motion for the court to reconsider the denial of fees would be considered a true post-trial motion. (See *Benet Realty Corp. v. Lisle Savings & Loan Association* (1988), 175 Ill. App. 3d 227, 529 N.E.2d 718, *appeal denied* (1989), 124 Ill. 2d 553, 535 N.E.2d 912.) Similarly, if a section 2—611 motion was brought *as a part of a motion to dismiss* (under law then in effect), resolution of the fee question was considered part of the main action and thus a proper subject of a post-trial motion. (See *Hise v. Hull* (1983), 116 Ill. App. 3d 681, 452 N.E.2d 372.) Under the *Hise* analysis, Carl's fee petition would not be consid-

ered a true post-trial motion, since he filed his petition for fees as a separate motion rather than as part of the motion to dismiss.

As the court in *Marsh* pointed out, however, section 2—611 was amended and in its current incarnation (Supreme Court Rule 137), attorney fee claims *must* be brought as part of the underlying action and not as a separate action. This is true even though a claim for attorney fee sanctions still may be viewed as a "claim" that is separate from the main relief. The *Marsh* court concluded that even if a judgment fully resolves the underlying litigation, as long as a claim for attorney fees is outstanding, the judgment may not be appealed *unless* the order appealed from contains the requisite finding of appealability pursuant to Supreme Court Rule 304(a).

Because the March 13 and June 12 orders in the pending case do contain the required finding, the pendency of Carl's fee petition did not affect their appealability. Carl's argument that the fee issue divested this court of jurisdiction fails; subsequent proceedings in the trial court on other matters did not affect the appealability of the June 12 order.

DID PLAINTIFFS WAIVE OR ABANDON THEIR JURISDICTIONAL
ARGUMENT?

■ O'Keefe's challenges to this court's jurisdiction are no more substantial than Carl's and may be summarily dispatched. As earlier noted, O'Keefe argues both that plaintiffs waived Rule 304(a) as a ground for jurisdiction and also abandoned any argument they might have had pursuant to Rules 301 and 303. We have concluded, however, that the sole possible base for our jurisdiction is pursuant to Rule 304(a). Plaintiffs' appeal was reinstated by order of this court when plaintiffs amended their statement of jurisdiction to rely on Supreme Court Rule 304(a). The waiver argument necessarily fails; we have expressly allowed that which is said to be waived.

As for the assertion that plaintiffs have abandoned any argument that the June 12 order disposed of all claims and thus was appealable under Rules 301 and 303, we agree. They have abandoned it, and rightly so. It is defendants who persist in arguing that the June 12 order resolved all matters and therefore is subject to the operation of Rule 303(a)(2) regarding the filing of post-trial motions. To that end, they ignore the Rule 304(a) finding and its significance. Hence, while plaintiffs' initial mistaken view of jurisdiction may have started the argument, defendants have chosen to prolong it. We conclude, finally, that we do have jurisdiction over this appeal.

## II

We next consider whether counts III and VII state recognizable causes of action under Illinois law.

COUNT VII—VIOLATIONS OF THE ILLINOIS BUSINESS CORPORATION ACT

Defendants Carl and Show-Biz cite a single case in the 1½ pages of argument in their brief in defense of the trial court's dismissal of count VII. According to them, the complaint failed to meet the minimal requirements of pleading because it made "reference to Paragraph 1 through 43, in a conclusionary manner" and used "a shotgun approach" to get around the pleading requirement of setting out the facts relied upon to state a cause of action under the Business Corporation Act.[4] Defendants add that corporations are creatures of statute and may only be dissolved according to statute, citing *Central Standard Life Insurance Co. v. Davis* (1957), 10 Ill. 2d 566, 141 N.E.2d 45.

Defendants' argument is puzzling, however, because far from being conclusory, we find the complaint to be perhaps excessively detailed. All four counts begin with the same first 23 paragraphs, which set out background information regarding the formation of Show-Biz and the relationships of the parties. Christel, Carl, and Charles DiCaro (Charlie) formed the corporation in 1984, with O'Keefe acting as corporate counsel. Carl and Christel had known each other for several years when he introduced her to Charlie. The three agreed to contribute $30,000 each and act as the officers and directors, each holding one-third of the total shares. Each was to have specific jobs and to help manage the business. In the spring of 1986, disputes arose between Carl and Charlie. Charlie informed the other two that he wished to sell his shares. In 1987, following the disputed sale of Charlie's stocks to Carl, Carl cut Christel off from the business and terminated her employment.

In paragraphs 24 through 57 of count VII, Christel spells out the factual basis for the shareholder oppression theory. She alleges that from October 1984 to June 1987, no meetings of the shareholders or directors were ever held. On June 9, 1987, pursuant to written notice by Christel, a special meeting of the board of directors of Show-Biz took place. Carl and Christel were the two remaining directors and shareholders. (By this time, Charlie's shares had been sold to Carl.)

---

[4]This reference to the numbers of paragraphs cited is inaccurate, as count VII of the second amended complaint incorporates by reference paragraphs 1 through 23 of the common facts and then continues for an additional 34 paragraphs.

O'Keefe also attended the meeting, along with Christel's attorney. According to the allegations of count VII, Carl announced at the meeting that "as the major stockholder" he was going to "run this corporation the way it is supposed to be run." He also was making a resolution to relieve Christel of her duties as director and secretary and employee, because they "could not see eye-to-eye." He added that he had the same problems "when Charlie would act up" and that he (Carl) was "running the show."

Christel alleges that when she obtained the corporate records and minute book from O'Keefe in February 1987, entries had been made therein including "forgeries of her signature" and that "the dates on the stock certificates were erased and typed over" without her knowledge or consent. Shortly after the June 9 directors' meeting, Carl told Christel to submit a letter of resignation and to pick up her belongings and leave. Thereafter, in addition to terminating her, Carl froze her out of the business without authority or approval of the board of directors or shareholders. Among the specific acts she alleges: Carl removed Christel as a signatory on all the corporate accounts; he hid the checkbooks, changed the locks, ceased providing her with any financial information; and deprived Christel of the opportunity to participate in the management and business decisions of a corporation in which Christel had invested her life savings.

Additional allegations state that Christel has not received any distributions of profits or dividends and Carl has told her she will get no return on her investment in the future. Christel made written demand for an accounting, which Carl has ignored. Shortly after the institution of her lawsuit, and after the preliminary injunction hearing, Carl called a meeting of shareholders for Show-Biz, called the meeting to order, and then elected himself and his son as two of the three directors. He refused to permit Christel to discuss business matters including the financial condition of the corporation and the correction or amendment of erroneous corporate tax returns. Christel further alleges that at the meeting Carl refused to discuss the $20,000 subscription price that Charlie still owed to the corporation for his initial shares. This debt was assumed by Carl pursuant to his written agreement with Charlie.

Christel further alleges that after the above shareholder meeting, Carl called a meeting of the board of directors at which he was elected president and his son was elected secretary. Salaries of $10,000 were approved for Carl and his son (a full-time college student at Southern Illinois).

Count VII goes on. Christel alleges that Carl violated the previously entered restraining order by entering on the records of Show-Biz a false entry showing that Christel owed a debt of more than $15,000 to the corporation. She alleges that financial statements for the corporation produced through discovery show dramatic reductions in the corporate earnings since Carl's unilateral actions. This raises serious question as to Carl's mismanagement of the business, she asserts, as shown by Carl's manipulation of inventory and reserves for depreciation, to understate the corporation's value. She also states that he has increased the salaries of himself and his son while the corporation's earnings have dropped.

■ We do not agree with Carl that the above summary of Christel's allegations are conclusory. She sets out specific actions that Carl took to deny her access to and information regarding the business she helped start, finance, and run for several years. Her allegations as to the drop in corporate earnings since Carl ousted her and took over are backed by specific dollar amounts taken from the financial statements of Show-Biz. Since the quantum of proof and matters of credibility are not in issue on motions to dismiss pleadings, we must take Christel's allegations as true. That being the case, we do not agree that count VII fails to state a cause of action.

■ Pursuant to section 12.50(b)(2) of the Illinois Business Corporation Act of 1983 (Ill. Rev. Stat. 1989, ch. 32, par. 12.50(b)(2)), a court may dissolve a corporation in an action by a shareholder if it is established that "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive or fraudulent." Shareholder oppression has not been limited to actions defined as "illegal" or "fraudulent" or necessarily including misapplication of corporate assets or mismanagement of funds. (See *Central Standard Life Insurance Co. v. Davis* (1957), 10 Ill. 2d 566, 573, 141 N.E.2d 45.) In *Gidwitz v. Lanzit Corrugated Box Co.* (1960), 20 Ill. 2d 208, 170 N.E.2d 131, the court applied the term in the context of a corporation with two equal shareholder factions, one of which had taken over control and run the corporation for years, to the exclusion of the other faction. In holding that such conduct was oppressive, the court followed *Central Standard* and noted that the word need not necessarily savor of fraud or refer to imminent disaster; rather, it can contemplate a- continuing course of heavy-handed conduct.

■ In the pending case, Christel's allegations set out a course of unfair and heavy-handed conduct that may be fairly viewed as oppression under the statute. Defendants have declined to squarely address

the theory in their brief and rely instead on an argument of form over substance. By insisting that plaintiffs' pleading is merely conclusory, defendants avoid an explanation of why the detailed facts in count VII fall short of stating an action for shareholder oppression.

Plaintiffs, on the other hand, cite a number of cases in support of their position. See, *e.g.*, *Gidwitz*, 20 Ill. 2d 208, 170 N.E.2d 131 (president and controller of 50% shares acted as sole proprietor while paying technical respect to corporate form and laws; his continuing course of conduct that excluded other shareholders from participation in the business and income was held to be oppressive, justifying dissolution of corporation); *Notzke v. The Art Gallery, Inc.* (1980), 84 Ill. App. 3d 294, 405 N.E.2d 839 (one of three equal shareholders was "demoted" to minority status through a "conspiratorial ploy" involving transfer of stock and then fired from employment after being accused of theft; appellate court affirmed trial court's judgment in favor of minority shareholder based on oppression); *Compton v. Paul K. Harding Realty Co.* (1972), 6 Ill. App. 3d 488, 285 N.E.2d 574 (president shareholder's "overbearing and heavy-handed" course of conduct included imperious attitude and failure to consult with plaintiff or allow plaintiff to participate in the business); see also *Gray v. Hall* (1973), 10 Ill. App. 3d 1030, 1034, 295 N.E.2d 506 (reversing trial court's denial of minority shareholders' request for accounting to determine whether acts of majority shareholders were oppressive).

Show-Biz is not a large corporation with publicly traded stock. Christel alleges that she put her life savings into the business and helped run it for several years before Carl decided to take over. Carl not only took over control but allegedly enriched himself and his son with corporate assets at the expense of Christel's rights as shareholder. He supposedly told her she would receive no profit or dividend in the future, while apparently writing off Charlie's $20,000 debt to the corporation. At the same time, the financial statements of the business show a significant drop in earnings. Furthermore, Carl's actions as controlling shareholder cannot be divorced from his alleged misconduct in acquiring that controlling interest in the first place. See *Notzke*, 84 Ill. App. 3d 294, 405 N.E.2d 839.

We conclude that plaintiffs' count VII should not have been dismissed for failure to state a cause of action. Accordingly, we vacate the dismissal of that count and reinstate it.

COUNT III—THE CLAIM AGAINST O'KEEFE

We find the allegations of count III to be more problematical than those of count VII. We agree with the trial court that the attorney for

a corporation, even a closely held one, does not have a specific fiduciary duty toward the individual shareholders. (*E.g., Felty v. Hartweg* (1988), 169 Ill. App. 3d 406, 523 N.E.2d 555.) We also agree that plaintiffs do not assert, and cannot assert, the existence of an attorney-client relationship between O'Keefe and Christel or a third-party beneficiary theory. Therefore, attorney malpractice is not an issue.

Count III of the second amended complaint, in paragraph 28, incorrectly states O'Keefe's duty as deriving from his status as attorney for the corporation who "owed the shareholders equally a duty of strict fairness and utmost good faith in dealing with the affairs of the corporation and its shareholders." The count goes on to assert that by accepting Christel's $5,000 initial payment for half of Charlie's shares and by representing to Christel that she need not obtain independent counsel for the joint purchase transaction, O'Keefe breached his duty when he then drafted the purchase agreement in Carl's name only and for Carl's sole account. Moreover, O'Keefe's office kept Christel's check for $5,000 for seven months without explanation before returning it to her.

The transcript of the hearing on this count reveals that the trial court believed that plaintiffs' counsel was able to state an actionable theory during oral argument, but that plaintiffs had failed to use the right words in the complaint. The court commented, "[S]o much of this is in your head but not on the paper. That's what I've been trying to get to you, you have got to put down the obvious things." The court then added that "[p]leadings are to be strictly construed and that the count must be viewed strictly in terms of the wording within it."

■ We acknowledge that count III does not accurately state the nature of the legal duty that O'Keefe is alleged to have breached. We also believe that the trial court took great pains to allow all parties to argue at length and to brief at even greater length. At some point, a trial court is justified in refusing to allow lawyers additional time to get their pleadings in order. The fault is not entirely plaintiffs', however, because they were subjected to repeated challenges at every step, from discovery requests to numerous motions to dismiss and objections to the filing of amended pleadings. At the same time defendants were challenging the legal sufficiency of the complaints, they were also filing answers and a motion for summary judgment. The parties fired off motions for sanctions right and left and no bone of contention was left unpicked. In light of the extensive factual allegations of the entire complaint, however, we cannot conclude that "no set of facts can be proved which will entitle plaintiff to recover" as

against O'Keefe. (*Ogle v. Fuiten* (1984), 102 Ill. 2d 356, 360-61, 466 N.E.2d 224, 226.) The standard, of course, is that pleadings are to be liberally, not strictly, construed "with a view to doing substantial justice between the parties." (Ill. Rev. Stat. 1989, ch. 110, par. 2—603(c); see *Dunavan v. Calandrino* (1988), 167 Ill. App. 3d 952, 522 N.E.2d 347, *appeal denied* (1988), 122 Ill. 2d 573, 530 N.E.2d 243.) If evidence to sustain the allegations is lacking, the trial court may enter directed findings. At the pleadings stage, however, we must take the facts as true and on that basis decide whether the conduct is actionable.

The second amended complaint alleges that O'Keefe assured Christel that he would handle, on her behalf, what was to be a joint stock purchase of Charlie's shares of the business. He told her she did not need her own lawyer and he accepted her deposit money at the same time he accepted an equal amount from Carl. Contrary to what he told Christel he would do on her behalf, he then prepared a purchase agreement in which Carl bought all of Charlie's shares in his own name. O'Keefe did not notify Christel of his own failure to do that which he said he would do and did not return her $5,000 for seven months after Carl secretly bought Charlie's shares.

In count IV, the constructive trust count against Carl, O'Keefe's name surfaces as a party to the transaction that is the basis of the constructive trust theory. Thus, while it is not alleged that O'Keefe and Carl acted in concert or conspired to defraud Christel, by deceiving her or otherwise defeating her opportunity to purchase half of Charlie's shares, we find that it is implicit in the complaint as a whole that much of the conduct complained of implicates O'Keefe as well as Carl. Therefore, dismissing the only count against O'Keefe without leave to amend is not appropriate unless it is clear the specific facts concerning O'Keefe's conduct cannot fit into a viable legal theory.

In his brief on appeal O'Keefe characterizes himself as a mere stakeholder of the deposits Carl and Christel made to purchase Charlie's shares. He denies any authority to act on behalf of individual shareholders, relying heavily on his status as attorney for the corporation. Plaintiffs, on the other hand, maintain that he acted as Christel's agent for the limited purpose of the joint stock purchase and is therefore liable under an agency-by-estoppel theory.

We believe that the scope of O'Keefe's undertaking, if any, is a question of fact to be resolved at trial. Because of the peculiar way in which this case proceeded, the record contains affidavits and discovery material in which key allegations of the complaint have been denied under oath. Matters of credibility have not been determined in a

trial, however, and at the pleadings stage we cannot speculate on what the evidence will establish. We do agree that the pleading of count III could be improved. Nevertheless, we would be remiss in holding that no possible claim could be asserted against an attorney (or anyone, for that matter) who had the apparent authority to handle a joint stock purchase transaction on behalf of two people; who made certain representations to induce one of them to forego independent counsel; who accepted deposits of money on behalf of the intended stock purchasers; and who then acted in the interests of one over the other. Accordingly, we hold that plaintiffs' factual allegations are sufficient to assert a duty—not based on O'Keefe's role as corporate attorney or as a shareholder's attorney, but as Christel's agent for a specific transaction. The allegations sustain a breach of the duty. The element of injury proximately caused by the breach may be more difficult to state. Possibly, she might claim as legal damages an amount equal to the value of the shares she would have owned had O'Keefe performed as stated. On the other hand, since O'Keefe as an agent would not be a "guarantor" that the joint stock purchase would go through as planned, some other means of determining damages might be appropriate, based on the element of deceit or concealment and the resulting loss of opportunity Christel had to compete for or negotiate on her own behalf. The effect of the transaction was to demote her from one of three equal shareholders, with equal control over the business, to a minority shareholder lacking the most rudimentary control or even information regarding the conduct of the business and its financial health. At the pleading stage, we must take care not to foreclose the fashioning of an appropriate remedy based on what the trial evidence might establish.

We conclude that plaintiffs have alleged an adequate basis for stating a claim for relief against O'Keefe. Because count III does not precisely state the agency theory, however, we believe plaintiffs should be allowed leave to amend this count.

Accordingly, we reverse the trial court's dismissal of counts VII and III for failure to state a cause of action; reinstate count VII; grant leave to amend count III; and remand for further proceedings.

Reversed and remanded.

JIGANTI, P.J., and JOHNSON, J., concur.